[No. F025758. Fifth Dist. Feb. 4, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
THOMAS MYERS, JR., Defendant and Appellant.

**COUNSEL**

James T. Wilson, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Shirley A. Nelson and Laura I. Heidt, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BUCKLEY, J.**—This case arose under unusual and tragic circumstances. During a relatively minor confrontation between Thomas Myers, Jr., and George Staley, Staley fell to the ground and struck his head on the concrete pavement. The impact fractured his skull and left him with serious and permanent neurological injuries. There was conflicting testimony about what caused Staley to fall. On the theory that Myers attacked Staley without provocation and knocked him unconscious with a punch in the nose, Myers was charged with assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(1))[1] and with battery resulting in serious bodily injury (§ 243, subd. (d)). Myers, on the other hand, maintained Staley was the aggressor and suddenly began yelling and poking him in the chest; when Myers pushed Staley away defensively, Staley accidentally slipped and fell on the wet pavement.

The jury evidently accepted Myers's version of events. It found him guilty of aggravated battery, but only of simple assault. (§ 240.) On appeal, Myers argues the court gave an inadequate self-defense instruction. Specifically, he contends that the standard instruction on self-defense against an assault (CALJIC No. 5.30) should have been modified to say that a person may, in appropriate circumstances, use reasonable force to resist a battery even when he has no reason to believe he is about to suffer bodily injury. We agree and will reverse.[2]

### FACTS

Thomas Myers, Jr., lived with Debra Lystad and their 12-year-old son Brandon in one of the 242 units at the Merit Manor apartments in Clovis. George "Bud" Staley, age 64, and his wife, Betty, managed the complex. Myers and Staley did not get along. Staley often confronted Myers over alleged violations of apartment rules, which Myers felt were being applied unfairly to him and his family. Staley denied, however, that he harbored any prejudice against Myers because Myers was a Black man living with a White woman.

[1] Except as noted, all future statutory references are to the Penal Code.

[2] We find it peculiar that an incident such as alleged here has not been the subject of previous case authority discussing this issue. However, we have found no such case.

Tension between the two men eventually developed to the point that Staley's supervisor instructed him to have no further contact with Myers, and to leave all future dealings with him to Betty. But this arrangement was not entirely successful. Staley and Myers still encountered each other occasionally at the apartment complex. And, according to Betty Staley, Myers told her, " 'If you don't keep that old man away from [me], . . . I can have him killed. . . .' "

About 6:30 in the evening of October 25, 1994, Staley was talking with another tenant in the parking lot of the complex when he saw Myers "burning rubber" in his car. Myers drove out of the complex and across the street to a self-service carwash, where he pulled into one of the bays and prepared to wash his car. Debra and Brandon walked across the street and met him there after stopping to get change at a nearby convenience store. Staley was annoyed by what he viewed as Myers's repeated violation of apartment rules and, notwithstanding his supervisor's no-contact order, he decided to go over and talk to Myers about it. Staley had, by his own admission, "a little bit of an attitude." He crossed the street and went through some bushes at the edge of the carwash to a paved area about 25 feet from Myers's car. Myers walked "swiftly" up to him and then, without saying a word, "he apparently hit me and knocked me totally out because I don't remember a thing after that." Staley asserted he did not do or say anything to provoke the attack.

Elizabeth Virgen, a leasing agent at Merit Manor, was returning home about this time when she saw Staley walking in an apparent daze along the sidewalk next to the apartment complex. There was blood on his nose and the back of his head, and he did not respond to her questions. As she started to walk Staley through the parking lot back to his apartment, Myers and two other people approached. Myers, according to Virgen, "was shaky, with his fists made, and he came to Bud real close, and he told him . . . 'I'm going to fuck you up. I'll beat the shit out of you,' and I had to push him away because he was like—it was like in a second that he was ready to punch him again."

Joel Flores, a tenant at Merit Manor who also went to Staley's aid, generally confirmed Virgen's account of these events.[3] He too described Myers as angry and threatening. And, drawing on his prior experience in the military as an emergency medical technician, Flores testified Staley was disoriented, his pupils were dilated, and he had a large laceration on his head. In addition, he recalled that Staley's nose was "slightly bleeding,

---

[3]Joel Flores's wife was also a manager at the Merit Manor apartments and, like Elizabeth Virgen, she worked with or for the Staleys.

looked swollen and the term we used called raccoon eyes, his eyes seemed to have bruised or black eyes almost. That usually happens when somebody gets punched in the nose too hard."

Staley was taken by ambulance to the hospital, where he remained for the next several days. He was found to have suffered a traumatic brain injury consisting of a skull fracture along his left forehead, a hemorrhagic contusion (bruising) around his left temple, and "a small amount of pneumocephalus" (air in his skull). The injury left him with "some cognitive and to a degree some behavioral deficits and problems" manifested particularly by "extremely poor memory, [and] poor concentration." Betty Staley described her husband since his injury as "cranky" and "very nervous" and she explained: "He didn't remember a lot of things, didn't remember a lot of our family. He was just kind of flat. He has no feelings toward me. He still doesn't. Has no feelings toward me at all."

Staley was subsequently treated by Dr. John Edwards, a specialist in physical medicine and rehabilitation. According to Dr. Edwards, Staley could have sustained his neurological injuries (but probably not his bloody nose) by falling backwards and hitting his head. The doctor noted, however, that someone who is falling will ordinarily react reflexively to protect his head. Therefore, given the extent of the injuries in this case, he expressed the opinion that Staley "had altered consciousness or loss of consciousness before his head hit the ground." Such loss of consciousness, he concluded, might have been caused by having been "frontally assaulted with a fist."

*Defense*

Myers, along with Debra and Brandon, gave a very different account of events. According to them, Myers's tires "squeaked" a little bit but he did not break traction in his car. Over at the carwash, he had the hood of the car up and was washing the engine when Staley came up suddenly behind him and started yelling angrily that " 'You people . . . [are] always causing trouble . . .' ". Myers turned and yelled back at Staley, telling him to go away. But Staley came closer and began poking Myers in the chest with his finger. With that, Myers pushed Staley away. He explained: "I wanted him to stop putting his hands on me. You know, I wanted him to get out of my face. I really wanted him just to go back across the street." The pavement in the carwash bay was wet and Staley was wearing leather-soled shoes. He slipped and fell backwards to the ground. Myers denied punching Staley or intending to injure him.

Debra and Brandon helped Staley up and walked with him back across the street to Merit Manor. There they were met by Elizabeth Virgen, who took

Staley the rest of the way to his apartment. Myers drove his car back to the complex and waited there for the police to arrive. He did not approach or threaten Staley in the parking lot, and denied Virgen's and Flores's assertions to the contrary.

Dr. Richard Goka, a specialist in the same field as Dr. Edwards, generally discounted the theory that Staley was struck in the nose and rendered unconscious before he hit the ground.[4] He testified that, in his opinion, there was simply no way to tell whether Staley was punched or pushed.

### DISCUSSION

Defense counsel initially asked the court to instruct the jury using CALJIC No. 5.30 on the right of self-defense against an assault, but later objected to the instruction as "totally inadequate" on the grounds that "[i]t's in conflict with CALJIC 9.11. It's at war with common sense . . . and it ignores the language of Penal Code Section 693." After considerable discussion, the court overruled counsel's objections to CALJIC No. 5.30, but agreed to modify CALJIC No. 9.11.[5]

CALJIC No. 5.30 as read to the jury stated: "It is lawful for a person who is being assaulted to defend himself from attack if [,] as a reasonable person, he has grounds for believing and does believe that bodily injury is about to be inflicted upon him. In doing so, such person may use all force and means which he believes to be reasonably necessary and which would appear to a reasonable person in the same or similar circumstances to be necessary to prevent the injury which appears to be imminent."

Myers's objection to this instruction, which he renews on appeal, was that it did not adequately cover his theory of the case under which he claimed the

---

[4]According to Dr. Goka, a punch to the nose hard enough to knock someone unconscious would be expected to cause obvious facial bruising and swelling (and possibly "raccoon eyes") within a few hours, a condition worth noting in the victim's medical records. Staley's records indicated only that he had some blood in his left nostril. The punch probably would also cause noticeable damage to the assailant's hand. There is no evidence Myers suffered any such injury.

[5]The court gave the following instruction based on CALJIC No. 9.11: "No words of abuse, insult or reproach addressed to or uttered concerning a person, however insulting or objectionable the words may be, if unaccompanied by any threat or apparent threat of bodily injury[,] or any assault upon the person[,] will justify an assault by any means of force likely to produce bodily injury. The provocation of such words alone does not constitute a defense to a charge of having committed such an assault." The instruction in this form omitted the term "great" immediately preceding the two references to "bodily injury."

As will appear, this modification was inconsequential, given the nature of Myers's objection. The unaltered instruction states that a person may not use force likely to cause great bodily injury (in this case a knockout punch) except to resist the real or apparent threat of the same sort of injury. Myers's objection went to his right to use less force (a push) to resist a simple battery (poking), which was unlikely to cause any bodily injury at all.

right to defend himself against a *battery*, i.e., the right to resist Staley's poking by pushing him away. The right to resist a battery, he maintains, is not necessarily dependent upon whether or not the battery poses an imminent danger of bodily injury. He asked the court to modify CALJIC No. 5.30 accordingly or to give a separate instruction on the right of self-defense against a battery.[6] The court rejected the request and limited counsel's closing argument to the jury to a theory of self-defense consistent with CALJIC No. 5.30. The prosecutor subsequently relied on the instruction to argue that Myers had no right of self-defense under the circumstances:

"So the person who wants to claim self-defense must have grounds for believing and must actually believe that bodily injury is about to be inflicted upon him. And this injury must appear to be imminent. No matter how you look at the case, no matter where you look in all the evidence, there was no testimony anywhere along the line that in fact some kind of bodily injury was imminent with respect to the Defendant Thomas Myers.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

". . . For there to be self-defense, we have to have the Defendant in a position where he actually feels some kind of bodily injury is going to be inflicted upon him. Bodily injury, not just somebody poking his finger. There's no evidence of that at all, a reasonable person would feel that bodily injury was about to be imposed."

Defense counsel was hard put to refute this argument. During his cross-examination, the prosecutor asked Myers whether, at the moment he pushed Staley away, he feared Staley was about to do him bodily harm. The defense offered to stipulate that Myers had no such fear, but the prosecutor refused to accept the stipulation. Myers's subsequent responses to the prosecutor's persistent questioning on this subject can best be described as equivocal and

---

[6]Myers offered two variations of a proposed self-defense instruction:

"A battery includes the slightest unlawful touching, if done in an insolent, rude, or angry manner. [¶] A person subjected to such battery need not retreat, but may use reasonable force to prevent the battery from continuing."

"A battery includes the touching of another person in a rude or insolent manner. A person subjected to a battery need not retreat, but may use reasonable force to prevent the battery from continuing."

The People correctly note that both of these instructions misstate the law because they fail to explain that the existence and extent of a person's right of self-defense must be viewed from the perspective of a reasonable person in a similar situation. (See *People* v. *Moody* (1943) 62 Cal.App.2d 18, 23 [143 P.2d 978].) However, trial counsel acknowledged as much in arguing for a modified instruction, and the trial court had a sua sponte duty to give a proper self-defense instruction in any event. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 716 [112 Cal.Rptr. 1, 518 P.2d 913].)

somewhat confusing, although at one time he did say he thought Staley might hit him.

"Resistance sufficient to prevent the [commission of a public] offense may be made by the party about to be injured . . . [¶] [t]o prevent an offense against his person . . . ." (§ 693.)[7] "A battery is any willful and unlawful use of force or violence upon the person of another." (§ 242.)

█ " 'It has long been established, both in tort and criminal law, that "the least touching" may constitute battery. In other words, *force* against the person is enough, it need not be violent or severe, it need not cause bodily harm or even pain, and it need not leave any mark.' [Citation.] [¶] 'The "violent injury" here mentioned is not synonymous with "bodily harm," but includes any wrongful act committed by means of physical force against the person of another, even although only the feelings of such person are injured by the act.' [Citation.]" (*People* v. *Rocha* (1971) 3 Cal.3d 893, 899-900, fn. 12 [92 Cal.Rptr. 172, 479 P.2d 372].)

█ It follows that an offensive touching, although it inflicts no bodily harm, may nonetheless constitute a battery, which the victim is privileged to resist with such force as is reasonable under the circumstances. The same may be said of an assault insofar as it is an attempt to commit such a battery.[8] To hold otherwise would lead to the ludicrous result of a person not being able to lawfully resist or defend against a continuing assault or battery, such as the act defendant alleged here.[9]

Here, the jury found Myers guilty in count 1 of simple assault rather than the charged offense of assault by means of force likely to produce great bodily injury. It thus evidently concluded that Myers had pushed rather than punched Staley. It is also reasonable to suppose that the jury credited Myers's account of events leading up to the confrontation, i.e., that Staley was poking him in the chest with his finger. As to count 2, the jury found Myers guilty as charged of battery resulting in serious bodily injury. Since there is no question Myers's use of force caused Staley to suffer serious bodily injury, his right, if any, to defend himself against Staley's poking was central to the jury's verdict.

---

[7]Similarly, section 50 of the Civil Code provides in part: "Any necessary force may be used to protect from wrongful injury the person or property of oneself . . . ."

[8]"An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240; see also *People* v. *Colantuono* (1994) 7 Cal.4th 206, 215-217 [26 Cal.Rptr.2d 908, 865 P.2d 704]; 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Crimes Against the Person, § 398, pp. 461-462.)

[9]In so holding we, of course, do not imply that we believe or disbelieve defendant's "version"; we merely say that the jury should have been given that opportunity.

We conclude the trial court erred in refusing to give a modified self-defense instruction, and that the error was prejudicial under the peculiar circumstances of this case.

## DISPOSITION

The judgment is reversed.

Dibiaso, Acting P. J., and Vartabedian, J., concurred.