Filed 4/27/15  P. v. Corona CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C073255 |
| v. | (Super. Ct. No. CM035987) |
| MARIO VIVEROS CORONA, | |
| Defendant and Appellant. | |

A jury convicted defendant Mario Viveros Corona of issuing a threat to commit a crime resulting in death or great bodily injury (Pen. Code, § 422)[1] and misdemeanor battery of a cohabitant (§ 243, subd. (e)(1)).  The trial court found defendant committed the offenses while he was on bail in Butte County case No. CM-035082

---

[1]    Undesignated statutory references are to the Penal Code.

(§ 12022.1). In this case, defendant was sentenced to serve four years and eight months in prison.[2]

On appeal, defendant contends (1) an apology letter he wrote to the victim should have been excluded as unduly prejudicial, (2) the trial court should have instructed sua sponte on adoptive admission, (3) he received ineffective assistance of counsel because his trial attorney did not request an instruction on adoptive admission, (4) a recording of the victim's 911 call should not have been admitted into evidence as a spontaneous statement under Evidence Code section 1240, and (5) a unanimity instruction should have been given because the prosecutor made no election about which of several acts was to be the basis for the single count of battery on a cohabitant.

We deem defendant's challenge to the admission of the apology letter to be forfeited for lack of objection at trial on grounds of undue prejudice and for failure to secure a ruling on his relevance objection. We reject the instructional error argument because defendant's letter was not an adoptive admission -- he did not adopt the assertion of another person. Consequently, the trial court neither had a duty to give an adoptive admission instruction nor did defense counsel have a duty to request such an instruction. We also conclude the trial court did not abuse its discretion in admitting the 911 call into evidence as a spontaneous statement. However, the trial court should have given

---

[2] Sentencing in this case was consolidated with Butte County Superior Court case No. CM-035082, in which defendant pled no contest to felony vandalism (§ 594, subd. (a)), resisting arrest (§ 148, subd. (a)(1)), and driving while intoxicated (Veh. Code, § 23152, subd. (b)). The court imposed an eight-month sentence to run consecutive to the felony criminal threat sentence imposed in this case. The court also imposed one-year concurrent sentences for the vandalism and drunk driving convictions in case No. CM-035082. Defendant does not challenge the convictions or sentence arising out of case No. CM-035082.

a unanimity instruction in the absence of an election by the prosecutor as to which of several possible acts supported the conviction for battery on a cohabitant.

Accordingly, we reverse the conviction for misdemeanor battery on a cohabitant. We affirm defendant's conviction of one count of criminal threat and the on-bail enhancement finding.

FACTUAL AND PROCEDURAL HISTORY

***Prosecution Evidence***

Defendant and Katy V. were living together in a dating relationship on March 6, 2012. Defendant drove Katy's children to school and told her they "were going to go out on a date the whole day, until the kids were out of school." Defendant did not take her out for a date. Instead, he left for most of the day. When he returned in the afternoon, he asked Katy for money to buy a plane ticket to Mexico. Defendant left again. The school called Katy to tell her no one had picked up her children. Defendant returned around 7:30 p.m. and agreed to go with Katy and her son Enrique to pick up her other son, Miguel, from a relative's house.

During the drive, defendant again asked Katy for money to buy a plane ticket. Katy told him she had no money. Defendant continued to ask for money and grew angry. Katy testified he "socked" her twice in the stomach. Defendant drove home and told Katy to walk with him to the bathroom. Katy asked him why they could not go out to eat that night. Defendant accused Katy of kicking the bottom of the bathroom door while it had fresh paint on it. Katy denied kicking the door. She testified, "And he was really mad, and he told me -- he grabbed me, sat me down on the toilet. I was sitting down on the toilet, and he was still arguing about the door having paint. I was crying. He got really mad, and he grabbed me, picked me up and laid me down on the bathtub, on the tub right next to the sink." As Katy was trying to get up, defendant punched her in the stomach.

3

While Katy lay in the tub and screamed, defendant's sister, Veronica, walked into the bathroom and asked, "What's going on?" Katy stood up. Defendant answered that nothing was going on and Katy was just getting ready to take a shower. Veronica walked away and defendant closed the door. Defendant would not let Katy leave. She recounted: "I got out of the tub, and he grabbed me, sat me back in the toilet. And I was sitting again in the toilet when he grabbed me again and he pushed me . . . ." She continued: "He grabbed me again, kind of pushed me. I was on my knees. When I fell in, I had my left hand leaning, holding myself up in the bathtub. He put his knee on top of my back, and he pulled my hair with his other hand, and turned it to the side and turned on the faucet. And he said that he was going to drown me and kill me in there."

Veronica came back into the bathroom and screamed an expletive in Spanish. She asked what defendant was doing. Defendant walked out of the bathroom without answering. Veronica gave Katy a hug and said her brother was "crazy" and "not to worry" because she "was going to be okay." Katy took her son and attempted to leave the house through the garage door. She saw defendant sitting in the car, in the dark. Katy could not run while holding onto her children. Veronica offered to look after them. Katy then exited the house through the main door, and went to the nearby house of defendant's aunt, Irma.[3] Katy appeared to Irma to be "crying a little" and a "little bit frightened."

Irma and Veronica formulated a plan over the telephone for Katy to come back and pick up her sons. But when she arrived at defendant's house, she found defendant waiting for her at the door and telling her to come back inside. Defendant refused to

---

[3] Due to shared surname with defendant and for the sake of clarity, we refer to defendant's relatives who testified at trial by their first names.

4

allow Katy's son, Miguel, to leave the house. Miguel, however, managed to run outside. Defendant ran outside too and tried to catch Katy. As they were running, Katy called 911. A partially redacted portion of the 911 call was played for the jury. Defendant was arrested later that evening.

A week later and while in jail, defendant wrote an apology letter to Katy in Spanish. The letter was translated into English and a partially redacted version was admitted into evidence at trial. In pertinent part, the letter read:

"Hello baby, how are thing's going? You know I continue here waiting for a reply from you. Forgive me for not being clear with you and not knowing how to value for what you are. Don't hold any hard feelings against me baby. That's not good for your feelings. Do not lose your way of being, nice and beautiful and pure ha ha ha . . . . I believe it was a bit to late to understand until today. I am sorry about a lot of things baby. Better we had stayed in Oregon with your mother and sister and none of this would have happened. Damn. [¶] I guess that we both needed help from our families in one way. I am sorry for failing you baby. Forgive me for not fulfilling my word as a man. I believe I was just a little something for you and the babies." Defendant's letter continued: "How are you? Why don't you want to talk to me. Baby forget about everything about the past and le[t's] try one more try to be together."

The prosecution also introduced evidence of prior domestic violence under Evidence Code section 1109. Katy testified defendant kicked her several times on February 26, 2012. The police responded, but no one was arrested. Katy feared the police would call Child Protective Services to remove her sons from the home. Katy further testified defendant hit her daily "[f]or everything and anything. He would get mad because -- he would remember my past relationships, and he would get mad because I had children."

*Defense Evidence*

Defendant testified on his own behalf. However, defendant was not asked, on direct or cross-examination, whether he hit Katy at any time. Defendant did admit he had been convicted of felony vandalism only a week before trial in this case.

Katy testified on cross-examination that Irma had witnessed the argument on March 6, 2010, over the plane ticket and saw defendant push and shove her. When shown a photograph showing bruising on her body related to a March 5, 2010 incident where defendant held a gun to her head during oral sex, she explained defendant beat her "so many times" she could not identify exactly when she received the depicted bruises.

Several witnesses testified they had never seen defendant violent with Katy or any bruising on Katy. Norma Corona, another aunt of defendant, testified that Katy came to live with her about a month after defendant was arrested. Norma stated she kicked Katy out of the house because she was drunk every day. Katy started dating other men at the time.

Jeffrey E. Hayes, a correctional lieutenant with the Butte County Sheriff's Office, testified Katy visited defendant in jail three times, each time listing herself as defendant's girlfriend.

DISCUSSION

I

*Admission of Defendant's Apology Letter*

Defendant argues his apology letter was not relevant and should have been excluded as unduly prejudicial under Evidence Code section 352. We deem the argument to be forfeited.

## A.

### *Defense Counsel's Objections in the Trial Court*

In an in limine motion, defense counsel objected to the admission of defendant's apology letter on grounds the letter "is inadmissible hearsay, is irrelevant and lacks foundation." In open court before trial began, defense counsel sought to exclude defendant's letter on hearsay and foundational grounds. Defense counsel noted the foundational objection might be withdrawn after the accuracy of the translation was verified by the translator. After the translator spoke with defense counsel, defense counsel renewed the objection based on a break in the chain of custody. During trial, defense counsel again renewed objections to the letter based on hearsay and foundational grounds. Defense counsel did not object on the basis of relevance or undue prejudice. And, defense counsel did not secure a ruling on the reference to the relevance objection in the in limine motion.

## B.

### *Forfeiture*

As the California Supreme Court has explained, " 'A party desiring to preserve for appeal a challenge to the admission of evidence must comply with the provisions of Evidence Code section 353, which precludes reversal for erroneous admission of evidence unless "[t]here appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated to make clear the specific ground of the objection or motion." ' (*People v. Morris* (1991) 53 Cal.3d 152, 187, disapproved on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.) A properly directed motion *in limine* may satisfy the requirements of Evidence Code section 353 and preserve objections for appeal. (53 Cal.3d at p. 190.) *However, the proponent must secure an express ruling from the court.* (*Id*. at p. 195.)" (*People v. Ramos* (1997) 15 Cal.4th 1133, 1171, italics added.) Here, defense counsel did not secure the trial

7

court's ruling on the relevance part of his objection to the admission of defendant's apology letter. Accordingly, the relevance objection has not been preserved for appeal. (*Ibid.*)

The undue prejudice claim under Evidence Code section 352 also has not been preserved for appeal because defendant's trial attorney did not make an objection on this ground in the trial court. "Insofar as defendant argues the evidence was inadmissible under Evidence Code section 352 because its potential to cause undue prejudice substantially outweighed its probative value, defendant forfeited this argument by failing to object on this basis at trial." (*People v. Valdez* (2012) 55 Cal.4th 82, 138.) Accordingly, we deem defendant's arguments regarding the relevance and undue prejudice of his apology letter to be forfeited.

## II

### *CALCRIM No. 357*

Defendant argues the trial court failed to instruct sua sponte on adoptive admissions after it admitted his apology letter into evidence. We disagree because there is no sua sponte duty to instruct on adoptive admissions and defendant's letter was not an adoptive admission.

### A.

### *No Sua Sponte Duty to Instruct on Adoptive Admissions*

Regardless of whether defendant's apology letter constituted an adoptive admission, the trial court had no duty to instruct on adoptive admissions in the absence of a request by defense counsel. As the California Supreme Court has explained, "[t]rial courts may certainly instruct on the matter if they think it best to do so. But, as the Evidence Code makes clear, courts are *required* to so instruct only at a defendant's request. When the court admits evidence subject to the existence of preliminary facts, it '[*m*]*ay, and on request shall*, instruct the jury to determine whether the preliminary fact

8

exists and to disregard the proffered evidence unless the jury finds that the preliminary fact does exist.' (Evid. Code, § 403, subd. (c)(1), italics added.) 'On its own terms, this provision makes it discretionary for the trial court to give an instruction regarding a preliminary fact unless the party makes a request.' (*People v. Lewis* (2001) 26 Cal.4th 334, 362.)" (*People v. Carter* (2003) 30 Cal.4th 1166, 1198 (*Carter*).)

Here, the record does not indicate defense counsel requested an instruction on adoptive admissions. Consequently, the trial court did not err in not instructing on adoptive admissions since the court had no duty to give such an instruction sua sponte. (*Carter*, *supra*, 30 Cal.4th at p. 1198.)

## B.

### *Not an Adoptive Admission*

Anticipating our conclusion that the trial court did not have a sua sponte duty to instruct on adoptive admissions, defendant claims he received constitutionally deficient legal representation when his attorney failed to request an instruction on adoptive admissions. We reject the claim because defendant's apology letter was not an adoptive admission.

As the *Carter* court noted about adoptive admissions, "*silence in the face of an accusation* is meaningful, and hence may be considered, only when the defendant has heard and understood the accusation and had an opportunity to reply." (*Carter*, *supra*, 30 Cal.4th at p. 1198, italics added.) Here, defendant's apology letter was not silence in the face of an accusation by Katy. To the contrary, defendant's apology letter noted Katy was not communicating with defendant. The apology letter does not constitute an adoptive admission because defendant did not adopt the statement of anyone else. Consequently, defendant did not receive ineffective assistance of counsel based on the failure of his trial attorney to request an inapplicable jury instruction. (*People v. Alcala*

9

(1992) 4 Cal.4th 742, 804 [rejecting claim of ineffective assistance of counsel for failure to request a jury instruction in a case in which the jury was adequately instructed].)

### III

### *Defense Counsel's Failure to Request Curative Instruction*

Defendant argues he received ineffective assistance of counsel because his trial attorney did not request a curative instruction during closing argument by the prosecutor. "By curative instruction," defendant asserts there needed to be "more than a brief admonishment to disregard the statement, but rather an instruction to the effect that no evidence of a face to face accusation had been presented." We are not persuaded.

### A.

### *The Prosecutor's Argument*

Defendant's claim centers on the portion of the closing argument in which the prosecutor argued: "Defense talks about the lack of evidence. Focus on why the defendant ma[d]e the statements he did in his letter, dated March 12, 2012, six days after he was arrested. Consider those statements not only in the letter but if you need to remember or consider the testimony regarding [Katy] as to what he did not do in that letter. He did not accuse her of lying. He did not accuse her of filing a false police report. Isn't that something that would be naturally done in that letter, that sort?"

Defense counsel interjected: "Objection, speculation, Your Honor." However, defense counsel did not secure a ruling on the objection or request that the jury be admonished.

### B.

### *Prosecutorial Misconduct*

Defendant's focus on the prosecutor's closing arguments is based on his assumption the apology letter was erroneously admitted into evidence. In parts I and II, we rejected defendant's challenges to the admission of the apology letter. Because

10

defendant has not established any error in the admission of the apology letter, we conclude the prosecutor did not engage in misconduct by referring to the apology letter during closing arguments. The prosecutor's argument referred the jury to the letter in evidence along with Katy's testimony. This was not misconduct.

Moreover, a prosecutor may comment on the evidence admitted during trial and suggest inferences that may be drawn from the evidence. (*People v. Medina* (1995) 11 Cal.4th 694, 757.) In response to defense counsel's argument that the evidence was insufficient, the prosecutor is entitled to emphasize admitted evidence and testimony that showed defendant's guilt. Consequently, defendant did not receive ineffective assistance of counsel when his trial attorney did not request a curative instruction during the prosecutor's closing argument.

## IV

### *Admission of the 911 Call Recording*

Defendant argues the recording of Katy's 911 call to the police should not have been admitted into evidence as a spontaneous statement. We reject the argument.

### A.

### *911 Call Recording*

During trial but outside the presence of the jury, the prosecutor stated he intended to play for the jury a recording of Katy's 911 call to the police on the night of the incident. The prosecutor moved to introduce the three- to four-minute-long recording as a spontaneous statement under Evidence Code section 1240. Defense counsel objected to admission of the recording as hearsay, pointing out Katy later gave a statement to the police that she had "kind of calmed down" before she called 911. After listening to the recording, the trial court admitted the recording into evidence. The trial court explained:

11

"The court, despite that statement [by Katy] later to an officer heard the intonation of [Katy] on the 911 recording, where [Katy] is speaking excitedly at points where it's so quickly that the content of what she's saying cannot clearly be discerned, and devolving into sort of a wailing kind of speech at one point where the dispatcher kind of interrupts her, and talking about the events that she witnessed, describing events that had occurred, and that the purpose of the call was in response to those events.  Court is going to find that the 911 recording is admissible under the hearsay exception under [section] 1240 of the Evidence Code."  Subsequently, the 911 call was played for the jury.  The jury was also provided with a partially redacted transcript of the call -- redacted to black-out portions of the transcript that did not clearly match the recording.

## B.

### *Spontaneous Statement Exception to the Rule Against Hearsay*

As the California Supreme Court has explained, "A statement may be admitted, though hearsay, if it describes an act witnessed by the declarant and '[w]as made spontaneously while the declarant was under the stress of excitement caused by' witnessing the event.  (Evid. Code, § 1240.)  ' "To render [statements] admissible [under the spontaneous declaration exception] it is required that (1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it." [Citations.]' (*People v. Poggi* (1988) 45 Cal.3d 306, 318 (*Poggi*).)  Spontaneous statements are deemed sufficiently trustworthy to be admitted into evidence because ' " 'in the stress of nervous excitement the reflective faculties may be stilled and the utterance may become the

12

unreflecting and sincere expression of one's actual impressions and belief.' " [Citation.]'
(*Ibid.*)" (*People v. Gutierrez* (2009) 45 Cal.4th 789, 809-810 (*Gutierrez*).)

Whether an out-of-court statement satisfies the requirement of the spontaneous
statement exception to the rule against hearsay "is, in general, largely a question of fact.
(See, e.g., *People v. Washington* [(1969)] 71 Cal.2d [1170,] 1176–1177.)  The
determination of the question is vested in the court, not the jury.  (E.g., *People v.
Tewksbury* (1976) 15 Cal.3d 953, 966, fn. 13.)  In performing this task, the court
'necessarily [exercises] some element of discretion. . . .' (*Showalter v. Western Pacific
R.R. Co.* [(1940)] 16 Cal.2d [460,] 469.)" (*People v. Poggi* (1988) 45 Cal.3d 306, 318
(*Poggi*).)  For this reason, the trial court's decision whether to admit the evidence as a
spontaneous statement is reviewed for abuse of discretion and upheld if supported by
substantial evidence.  (*People v. Phillips* (2000) 22 Cal.4th 226, 236.)

## C.

### *The 911 Recording*

Defendant contends the trial court abused its discretion by determining the 911
call recording to be a spontaneous statement under Evidence Code section 1240 by
relying on the "tone of [Katy's] voice while ignoring the undisputed evidence that the call
was placed as part of a deliberated plan or scheme."  We reject the contention.

The trial court's fact finding ability on this issue goes precisely to the question of
whether the declarant is acting under nervous and unreflecting excitement or is
sufficiently calm and reflective to issue scheming statements.  (*Gutierrez*, *supra*, 45
Cal.4th at pp. 809-810.)  As the trier of fact, the trial court was not required to accept a
later statement by Katy about having calmed down in the interim.  Instead, the trial
court had the discretion to find, based on its review of the recording, Katy's call
demonstrated such emotion that precluded reflection.  " 'Neither lapse of time between
the event and the declarations nor the fact that the declarations were elicited by

13

questioning deprives the statements of spontaneity *if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance.*' " (*People v. Brown* (2003) 31 Cal.4th 518, 541 (*Brown*), quoting *Poggi*, *supra*, 45 Cal.3d at p. 319.)

In *Brown*, the California Supreme Court upheld a trial court finding that a statement made by a witness about two and one-half hours after a murder was a spontaneous statement under Evidence Code section 1240. (31 Cal.4th at p. 541.) The trial court noted that the declarant, Mark Bender, "was crying, shaking and visibly upset when he made the statement." (*Ibid.*) Despite the passage of time, Bender's inability to control his body from shaking or stop crying supported the trial court's conclusion. (*Ibid.*) As in *Brown*, the evidence in this case showed Katy's statements were spontaneous statements devoid of reflection. The transcript of the 911 call indicates many of Katy's statements were unintelligible because of her crying. At one point, the dispatcher told Katy, "[Y]ou can't talk to me when you're crying because I can't understand you, okay?" Katy's descriptions of the events leading up to the incident were so quick the dispatcher told her to "stop for a second." The trial court was within its discretion to reject defense counsel's objection on grounds Katy was fabricating her distress.

We reject defendant's contention the spontaneous statement was inadmissible because no independent evidence "that [defendant] was holding the children hostage or that he had in fact hit or threatened [Katy] as alleged in the 911 call." Although defendant cites *People v. Albertson* (1944) 23 Cal.2d 550, that case does not support his contention. *Albertson* did not involve spontaneous statement evidence. Instead, that case involved evidence of other crimes. (*Id.* at p. 580.) Evidence Code section 1240 does not require independent corroborating evidence to admit a spontaneous statement. (See also *Gutierrez*, *supra*, 45 Cal.4th at pp. 809-810.)

14

In sum, defendant has not established that the trial court abused its discretion in admitting the 911 call recording under Evidence Code section 1240.

## V

### *Unanimity Instruction*

Defendant contends the trial court erred in failing to give a unanimity instruction for the charged offense of cohabitant battery. In support of the contention, he argues the prosecution's evidence showed separate acts, each of which could have provided a factual basis for the cohabitant battery conviction. Defendant's argument has merit.

### A.

### *Trial Court's Sua Sponte Duty to Give Unanimity Instruction*

The jury must unanimously agree a defendant is guilty of a specific crime. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*).) "Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. [Citations.] [¶] This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.'" (*Ibid.*) To ensure juror unanimity, a prosecutor may use an opening statement or closing argument to elect a specific instance of the charged offense. (*People v. Mayer* (2003) 108 Cal.App.4th 403, 418–419; *People v. Hawkins* (2002) 98 Cal.App.4th 1428, 1454–1455.) If the prosecutor does not make an election, the court has a sua sponte duty to instruct on unanimity. (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1534.)

A unanimity instruction is not required, however, if the case falls within the continuous course of conduct exception. (*People v. Thompson* (1984) 160 Cal.App.3d 220, 224.) This exception arises in two contexts. First, a unanimity instruction is not required when the criminal acts are so closely connected they form part of the same

15

transaction, and thus one offense. The second exception occurs when the statute defines the offense to comprise a continuous course of conduct over a period of time. (*Ibid*.) "Cases applying the continuous conduct exception have generally relied on statutory interpretation to justify a conclusion that the nature of the crime is ongoing." (*Id.* at p. 225.)

The *Thompson* court concluded spousal battery falls within the continuous course of conduct exception based on the language of section 273.5. (160 Cal.App.3d at pp. 224-225.) *Thompson* reasoned that "[a] comparison of the legislative history of the relevant child abuse (§ 273d) and spousal battering (§ 273.5) statutes demonstrates their similarity, and supports a conclusion that both are aimed at repetitious activity which culminates in prohibited conduct. [¶] Originally, both crimes were included in the same statute, namely section 273d. In 1977 the Legislature amended section 273d, and added section 273.5 to separate the provisions relating to child abuse from those relating to wife abuse. However, the operative language in these statutes remained the same. No inference can be drawn from such amendment that the Legislature intended to change the nature of the crimes. Retention of the nearly identical language for each crime negates such interpretation." (*Thompson*, at pp. 225-226, fns. omitted.)

As *Thompson* pointed out, section 273d provided in pertinent part, that "[a]ny person who willfully inflicts upon any child any cruel or inhuman corporal punishment or injury resulting in a traumatic condition is guilty of a felony . . . .' Corresponding language is found in section 273.5: 'Any person who willfully inflicts upon his or her spouse, or any person who willfully inflicts upon any person of the opposite sex with whom he or she is cohabiting, corporal injury resulting in a traumatic condition, is guilty of a felony . . . .' " (*Thompson*, *supra*, 160 Cal.App.3d at p. 226, fn. 5.) A subsequent case distilled the rationale of *Thompson* as resting on the principle that a "continuous conduct crime" is one where "the gravamen of the offense lay in the *cumulative result* of

16

the acts, each of which alone might not be criminal." (*People v. Salvato* (1991) 234 Cal.App.3d 872, 882, italics added.) Thus, the harm addressed by section 273.5 -- namely, a traumatic condition -- is one that may be the cumulative result of a defendant's criminal course of conduct.

The offense at issue in this case, battery of a cohabitant under section 243, subdivision (e)(1), is not defined by the victim's condition. Instead, battery of a cohabitant reflects the rule that "an offensive touching, although it inflicts no bodily harm, may nonetheless constitute a battery . . . ." (*People v. Myers* (1998) 61 Cal.App.4th 328, 335 (*Myers*).) Section 243, subdivision (e)(1), simply defines the offense as a battery against a cohabitant by providing that "[w]hen a battery is committed against a spouse, a person with whom the defendant is cohabiting, a person who is the parent of the defendant's child, former spouse, fiancé, or fiancée, or a person with whom the defendant currently has, or has previously had, a dating or engagement relationship . . . ."

Thus, in contrast to the element of traumatic condition required for section 273.5, the battery on a cohabitant requires no evidence of injury or any other condition suffered by the victim. " ' "It has long been established, both in tort and criminal law, that 'the least touching' may constitute battery. In other words, *force* against the person is enough, it need not be violent or severe, it need not cause bodily harm or even pain, and it need not leave any mark." [Citation.] [¶] "The 'violent injury' here mentioned is not synonymous with 'bodily harm,' but includes any wrongful act committed by means of physical force against the person of another, even although only the feelings of such person are injured by the act." [Citation.]' (*People v. Rocha* (1971) 3 Cal.3d 893, 899–900, fn. 12.)" (*Myers*, *supra*, 61 Cal.App.4th at p. 335.) Indeed, "[i]f serious bodily injury had been inflicted on the victim, felony charges [may instead be] filed pursuant to . . . section 243, subdivision (d) . . . ." (*People v.*

17

*Jackson* (2000) 77 Cal.App.4th 574, 576.)  In short, the continuous course of conduct exception does not apply to the battery of a cohabitant for which defendant was convicted as a misdemeanor.

**B.**

*Evidence Regarding Cohabitant Battery*

Although defendant was charged with a single count of misdemeanor cohabitant battery, the evidence indicated defendant committed several instances of cohabitant battery on March 6, 2012.

Katy testified defendant "socked me in my stomach twice" during the early evening when they were driving home together.  At the time defendant was "very angry" about Katy refusing to give him money for a plane ticket to Mexico.  After they arrived at home, defendant told Katy to follow him into the bathroom.

Katy next testified defendant "was really mad, and he told me -- he grabbed me, sat me down on the toilet."  Katy was crying.  Katy explained defendant was "really, really mad at me, yelling at me because there was paint on the door."  Defendant believed Katy had kicked the door after he had freshly painted it.  Defendant checked her shoes.

According to Katy, defendant then "got really mad, and he grabbed me, picked me up and laid me down on the bathtub, on the tub right next to the sink."  Defendant did not lay her down "in a gentle manner."  When Katy tried to get up, defendant punched her in the stomach.  Katy was screaming.  Hearing screaming, defendant's sister walked in and checked on them.  Defendant told his sister nothing was going on and sent her away.

Katy testified:  "I got out of the tub, and he grabbed me, sat me back in the toilet.  And I was sitting again in the toilet when he grabbed me again and he pushed me, leaning . . . ."  Katy apparently fell into the bathtub.  At that point, Katy stated:  "He grabbed me again, kind of pushed me.  I was on my knees.  When I fell in, I had my left hand leaning, holding myself up in the bathtub.  He put his knee on top of my back, and he pulled my

18

hair with his other hand, and turn[ed] it to the side and turned on the faucet. And he said that he was going to drown me and kill me in there." Defendant's sister returned a second time to the bathroom and screamed an expletive in Spanish. Defendant said nothing and left.

Despite the evidence of several batteries, the trial court did not give a unanimity instruction. For lack of a jury instruction on unanimity, we turn to the question whether the prosecutor made an election of which specific act should serve as the basis for a cohabitant battery conviction.

During closing arguments, the prosecutor told the jury: "Defendant is guilty of domestic battery when the people prove the defendant willfully touched [Katy] in a harmful or offensive manner. [¶] This element was satisfied as soon as defendant picked up [Katy] to place her into the bathtub. The defendant then punched Katy in the stomach."

Rather than constituting an election, the prosecutor's statement to the jury showed at least two instances of battery occurred:

First, the prosecutor noted the element of offensive touching was complete by the time defendant picked Katy up to place her in the tub. This remark could have related to defendant socking the victim in the stomach twice before they entered the bathroom, or defendant's grabbing the victim and sitting her down on the toilet. Each of these instances of offensive touching sufficed to constitute cohabitant battery.

Second, the prosecution's statement indicated an additional battery occurred by stating that "defendant *then* punched Katy in the stomach." (Italics added.) Rather than constituting an election of a single instance, the prosecutor indicated the offensive touching element of cohabitant battery was satisfied *twice* -- namely once by the time defendant sat Katy down on the toilet and another time when he then hit her in the

19

stomach. For lack of a valid election of a single instance of cohabitant battery, the trial court erred by not giving a unanimity instruction to the jury.

## C.

### *Prejudice*

We join the growing consensus that appellate courts assess error in the failure to give a unanimity instruction under the harmless error standard articulated in *Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824]. (E.g., *People v. Hernandez* (2013) 217 Cal.App.4th 559, 576; *People v. Milosavljevic* (2010) 183 Cal.App.4th 640, 647; *People v. Norman* (2007) 157 Cal.App.4th 460, 466 (*Norman*); *People v. Smith* (2005) 132 Cal.App.4th 1537, 1545.) Citing *Norman*, the People acknowledge we must reverse unless we can declare the error harmless beyond a reasonable doubt. (See *Norman*, *supra*, at p. 466.) This standard is consistent with the observation by the California Supreme Court "that the requirement of unanimity in criminal cases is of constitutional origin." (*People v. Jones* (1990) 51 Cal.3d 294, 321.) Under the facts of this case, the error does not appear harmless beyond a reasonable doubt.

The cohabitant batteries preceding and including defendant's punching Katy in the stomach while she was in the bathtub were different from each other. Defendant first punched Katy twice in the stomach while in the car. This incident was separate in time from the later events in that defendant and Katy arrived at home, exited the car, and entered the bathroom.

Defendant's grabbing Katy and sitting her onto the toilet was different in nature than the other instances in which he hit her in the stomach. Defendant then hit Katy in the stomach after he forced her into the bathtub. This instance was different in time and manner from the grabbing her and putting her into the bathtub.

We need not consider additional instances of cohabitant battery the evidence showed defendant to have committed on March 6, 2012. The prosecutor's statement to

the jury indicated at least two separate batteries were committed by defendant on that date.  Because of the difference in the batteries referenced by the prosecutor, we cannot declare the lack of a unanimity instruction to have been harmless beyond a reasonable doubt.

## DISPOSITION

Defendant Mario Viveros Corona's conviction of count 2, misdemeanor battery on a cohabitant (Pen. Code, § 243, subd. (e)(1)), is reversed.  In all other respects, the judgment is affirmed.


    HOCH    , J.


We concur:


    BLEASE    , Acting P. J.


    HULL    , J.