Filed 5/26/21  P. v. Armas CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GREGORY DANE ARMAS,<br><br>    Defendant and Appellant. | H045686<br>(Santa Clara County<br> Super. Ct. No. C1518801) |

A jury convicted appellant Gregory Dane Armas of second degree murder, misdemeanor battery on a woman with whom he had a child, and misdemeanor violation of a protective order.  The trial court sentenced Armas to 16 years to life in prison.

On appeal, Armas asserts the trial court erred in its instruction to the jury on self-defense.  He further contends the trial court erroneously at sentencing imposed a protective order under Penal Code section 136.2 and we should remand this matter for a hearing regarding his youth under *People v. Franklin* (2016) 63 Cal.4th 261.

For the reasons explained below, we affirm the judgment without prejudice to Armas filing a motion in the trial court under Penal Code section 1203.01 for the purpose of making a record for a future youth offender parole hearing.

# I. FACTS AND PROCEDURAL BACKGROUND

A. *Procedural Background*

In June 2016, the Santa Clara County District Attorney (district attorney) filed an information charging Armas with the murder of Ulises Omar Denova (Pen. Code, § 187;[1] count 1), inflicting corporal injury on a partner while having a prior domestic violence conviction within seven years[2] (§ 273.5, subds. (a), (f)(1); count 2), and misdemeanor contempt of court for violating a protective or stay-away order (§ 166, subd. (c)(1); count 3). All the crimes allegedly occurred on or about July 30, 2015. In count 1, the information further alleged that Armas personally used a deadly or dangerous weapon (a knife) in the commission of the murder (§ 12022, subd. (b)(1)) and intentionally and personally inflicted great bodily injury (§ 1203.075).

In December 2017, with respect to count 1, the jury found Armas not guilty of first degree murder but guilty of second degree murder and found true both allegations. As to count 2, the jury found Armas not guilty of inflicting or attempting to inflict corporal injury but guilty of the lesser included offense of domestic violence battery (§ 243, subd. (e)). The jury also found Armas guilty as charged on count 3.

In February 2018, the trial court sentenced Armas to 16 years to life in prison on count 1 and one year and six months in county jail, respectively, for the misdemeanor convictions on counts 2 and 3. The court deemed the county jail terms served. In addition, under section 136.2, the court issued a 10-year, no-contact protective order protecting Pricilla G., as recommended by the probation officer.

---

[1] Unspecified statutory references are to the Penal Code.
[2] To protect the privacy of the victim alleged in count 2, we refer to her as Pricilla G. or Pricilla. (Cal. Rules of Court, rule 8.90(b)(4).) Moreover, we refer to Pricilla and Armas's child as A.A. (Cal. Rules of Court, rule 8.90(b)(10).)

B.  *Evidence Presented at Trial*

      1.  <u>Prosecution Evidence</u>

Armas and Pricilla G. started dating in 2012, when Armas was 18 years old and Pricilla was 17.  They had an on-and-off relationship from 2012 to 2015 and sometimes lived together.  In November 2014, Pricilla gave birth to their daughter, A.A.

During the relationship, Armas abused Pricilla verbally, calling her "a bitch, a whore, [and a] slut."  He also was jealous when Pricilla was around other men.  In addition, Armas committed several acts of domestic violence against her.  In August 2012, Armas pushed Pricilla's face against a fence and was subsequently convicted of inflicting corporal injury.  In December 2013, Armas punched Pricilla to the ground and kicked her in the side, causing fractured ribs and a black eye and was convicted in June 2014 of misdemeanor domestic violence battery.  In March 2015, while Armas and Pricilla were living together, Armas hit Pricilla in the face with a coffee mug, causing a "really big bruise on [her] face," a "black eye," and a "slight concussion."  After this incident, Pricilla moved out of the house she was sharing with Armas, his mother, and his sister.  But Armas continued to have access to Pricilla's private Snapchat account to see pictures of A.A.

One night in April 2015, Pricilla let herself into Armas's house to ask him where he had been earlier.  Armas was recovering from shoulder surgery at the time, having broken his clavicle in an automobile accident a few weeks before.  Armas became angry when Pricilla woke him.  He began "shouting" and started "coming at" her.  Pricilla hit Armas on his injured shoulder because she was afraid that "he was going to hit [her]."

In April or May 2015, Pricilla began dating Ulises Omar Denova (the murder victim).  Their dating relationship was brief, lasting until the end of May or beginning of June 2015.  Armas was aware of Pricilla's relationship with Denova and had said he "d[id]n't care" that Pricilla was seeing Denova.

3

Pricilla was friends with Esteban "Steven" Moreno Flores, whom she had met in 2012. Flores was good friends with both Armas and Denova. Armas and Pricilla socialized with Flores and his girlfriend, Michelle Banuelos, and Armas had been to Banuelos's apartment in San Jose. Flores, however, did not hang out with Armas and Denova simultaneously, because there "was just [] tension between [Armas and Denova] for no reason" that Flores could discern. That tension preceded Armas's relationship with Pricilla. About one month before Denova's death in July 2015, Armas ended his friendship with Flores because Armas mistakenly believed that Flores had "set [] up" the relationship between Pricilla and Denova.[3]

On June 26, 2015,[4] Pricilla and Armas signed a custody agreement arranged through the family court that called for mediation sessions concerning Armas's visitation with A.A. The mediation procedure was a precondition for visitation, but Armas did not attend any of the mediation appointments. In addition, Pricilla sought and obtained a no-contact protective order for herself because she did not want further contact with Armas. Armas subsequently contacted Pricilla, including to see her "romantically" and to talk about their relationship. At trial, Pricilla admitted she had sex with Armas about three weeks before Denova was killed. She also testified that, around that time, Armas threatened to beat up Denova.

On July 29 (the day before Denova was killed), Pricilla planned to meet Flores and Banuelos at Banuelos's apartment to go hiking. Pricilla's father and stepmother agreed to babysit A.A. As Pricilla was leaving home to drive to Banuelos's apartment, she spoke to Flores who told her that Denova was at the apartment. Flores asked if Denova could

---

[3] At trial, Flores testified that he still considered Armas to be a friend and did not want to testify against him. Flores also said he wanted Denova to get justice for what happened to him.

[4] Unless otherwise indicated, all dates were in 2015.

join in their plans; Pricilla did not object. Pricilla, Flores, Banuelos, and Denova (the group) visited two local parks that afternoon. They ate some food and drank beer.

Throughout the day, Armas sent Pricilla text messages, which she ignored. Armas wanted to see A.A., but Pricilla did not want to have any issues with Armas. In some of the messages Armas sent that evening, he called Pricilla derogatory names like "bitch" and "whore."

At some point between the late afternoon and sundown on July 29, the group bought more beer and returned to Banuelos's apartment. They listened to loud music, drank, and played a drinking game. At Flores's invitation, Ruben Garcia arrived and also played the drinking game.[5] They drank a lot of alcohol and were intoxicated.

At some point that evening, Denova took his shirt off, and he and Pricilla had sex, leaving a used condom in the bathroom sink. In addition, Pricilla posted to her Snapchat account a picture of her kissing Denova that evening in the apartment.

Around midnight, Pricilla and Banuelos went to buy more beer using Pricilla's car. When they returned, Banuelos's designated parking space was occupied by another car. Pricilla parked behind the car and left a note on her car indicating Banuelos's address. None of the tires on Pricilla's car were deflated or slashed at the time she parked it.

Around 2:00 a.m. on July 30, someone loudly banged on the door of Banuelos's apartment. Flores looked out a window to see who was at the door and saw Armas. At trial, Flores said he "think[s]" Armas had one arm in a sling and "thought" Armas was holding a handgun in "the arm that was free."[6] Flores told Denova and Garcia not to open the door because there was a man outside with a gun.

_____

[5] Garcia was a close friend of Denova and had previously socialized with Flores and Denova. Garcia was not friends with Armas but had met him twice at parties. Garcia also was not close with Pricilla, but he knew that Pricilla and Armas had been a couple.

[6] An orthopedic surgeon who had operated on Armas's shoulder in March and April testified that Armas "would have [had] almost all of his normal function back" by

5

Around the same time, one of Banuelos's neighbors, B. Macias, heard loud knocking and people arguing outside.  He looked out his apartment window and "saw a man standing outside the neighbor's door."  The man "was yelling at somebody inside, 'Come outside, fucking pussy.  You don't fucking know me, bro.  I will fucking shoot on you.' "  The neighbor also heard the man say, " 'I will fucking kill you.' "  Two other neighbors heard similar yelling.

Pricilla went to the door thinking that the person knocking was the driver of the car in Banuelos's parking spot, a neighbor who was angry about the loud music, or the police.  She ran past Flores, Garcia, and Denova and opened the door.  Garcia testified that he thought it was the police pounding on the door and he went into the bathroom to urinate.  Pricilla immediately recognized Armas when she opened the door.  Armas had his T-shirt pulled up over his nose and his arm was not in a sling.  Armas pushed Pricilla, and she tried to push him out of the doorway.  Armas punched Pricilla in the face, causing her to fall to the ground outside and "black[] out" briefly.  Armas's friend, Alfonso Macias, was also outside the apartment.[7]  Alfonso helped Pricilla get back up and "told [Armas] not to hit the females."

Armas entered the apartment.  According to Flores, when Armas came in, Armas was holding (in his left hand) a "silver" knife "with a black handle," which "looked like a kitchen knife."  Flores testified that Denova pushed Flores behind him, and Garcia (in contrast to Garcia's own testimony) stood behind Denova and watched.

According to Banuelos, Armas "went straight to [Denova]," and Denova "took a step forward to confront [Armas]."  Armas and Denova screamed at each other in the living room as Banuelos went outside to tell Alfonso to "get [Armas] out" of there.

---

July 30, and "usually by three months postop, a patient [who is young and healthy] will have regained 95 percent of their function."

[7] Alfonso Macias was a boyfriend of Armas's cousin.  Alfonso Macias did not testify at trial.  Because there is a trial witness with the same last name, we refer to Alfonso Macias by his first name.

Flores similarly testified that Armas and Denova "were talking over each other at the same time for like three seconds." Garcia testified that he was in the bathroom at this time and, from there, he heard Denova say loudly, " 'chill, chill, chill,' " " 'Put the knife down. Let's fight,' " and " 'Let's throw hands.' " Garcia also heard female voices yelling, " 'Stop.' "

According to Flores, Denova "tried blocking himself" by putting his hands up in front of him in "a defensive stance." Armas "shoved the knife through [Denova's] chest" with "one thrust" of his left hand. Flores testified that this happened "[r]eally, really fast." Armas then exited the apartment.

Garcia testified that, as he came out of the bathroom, he saw a person wearing a T-shirt run out of the apartment. According to Flores and Garcia, neither they nor Denova had a knife and none of them attacked Armas before he stabbed Denova.

When Armas ran out of the apartment, he passed Pricilla, called her a "bitch," and spat on her. Although Pricilla did not see any blood on Armas's face or hands, Armas left drops of his blood from the apartment to the inside of his vehicle.[8] Pricilla entered the apartment and saw Denova standing in the living room with a bleeding stab wound in his chest. Pricilla did not see a knife on the floor or see anyone pick up a knife. Banuelos testified that the entire incident—from the banging on the door to when Armas ran out of the apartment—"happened in like ten minutes."

Around 2:08 a.m. on July 30, Flores and Garcia each called 911. Pricilla told Flores to go get her car so they could drive Denova to the hospital, but Flores discovered the tires on Pricilla's car were flat. Flores and Garcia attempted to assist Denova in the apartment, but he died before they could transport him to a hospital.

---

[8] Neighbor Macias testified that he saw the same person who had been yelling at the door run out of the apartment. Another neighbor heard "footsteps" running fast away from the apartment. A third neighbor testified that he saw a man wearing a white T-shirt running away and being chased by another man.

7

Banuelos initially told a police officer at the scene that the assailant "was possibly somebody named Dane" (i.e., Armas's middle name), but she later lied to detectives about her knowledge of the assailant. Pricilla initially lied to the police by saying that she did not know the assailant's identity. At trial, Pricilla testified that she lied because she was "scared" of Armas "hurting more people" and believed he might still have been in the area. Pricilla also called her father around when the police arrived and told him that she thought Armas had killed Denova. Later that day, Pricilla identified Armas during a police interview.[9]

Flores left the apartment after Denova died. The police stopped Flores nearby and took him into custody on an unrelated warrant. When the police interviewed Flores later that morning, he did not identify Armas as the assailant. The police did not locate the knife that had killed Denova.

A month later, on August 30, Armas attempted to flee from the police by jumping over a fence when they approached him outside a relative's home in San Jose. A few weeks after Armas was arrested, Flores identified Armas to police as the person who had stabbed Denova.

Forensic pathologist Dr. Michelle Jorden testified that Denova suffered an approximately three-inch-deep stab wound to his chest that punctured his heart and lung. Denova also had an abrasion next to the stab wound that most likely was caused by the handle of a knife. In addition, Denova had a one-and-one quarter inch stab wound in his lower left abdomen. Denova also suffered two superficial slash wounds on his lateral left chest and back.

Denova had several fresh or recent abrasions, bruises, and contusions on his body, including on the right side of his nose, the back of his right arm, and the front and back of his left leg. Denova's knuckles did not appear to have any bruising, and no defensive

[9] Richard Ferry, an expert in intimate partner violence, testified about the cycle of violence and behaviors that are often exhibited by victims of intimate partner violence.

wounds were identified. Denova's blood alcohol content measured .178 percent, which indicated that he was intoxicated when he died.

On cross-examination, Dr. Jorden said "[t]here could have been a struggle" that caused Denova's injuries. On re-direct examination, Dr. Jorden explained that "it's not uncommon to not see defensive wounds if it's a blitz attack, meaning the victim never saw it coming." But Dr. Jorden could not give a definitive answer about the significance of the lack of defensive wounds "without knowing more about the circumstances."

### 2. Defense Evidence

Armas testified in his own defense and was the sole defense witness.

#### a. Armas's Direct Testimony

Regarding the incident that occurred between Armas and Pricilla in March 2015, Armas said (contrary to Pricilla's testimony) that no coffee mug was involved and Pricilla had punched him in the face while he was holding A.A. Armas explained that, earlier that day, Pricilla "had a little too much to drink" at a barbeque and she fell while on a backyard patio, injuring her face.

Regarding the incident that occurred at Armas's home one night in April 2015, Armas said he "woke up to Pricilla punching [his] right shoulder." Armas subsequently "[f]iled to press charges" against Pricilla. Thereafter, Armas and Pricilla made an arrangement that if Armas "didn't press charges, she wouldn't take [him] through mediation" for visitation with A.A. Later, on June 30 (Armas's 22nd birthday), Pricilla texted Armas and offered him a visit with A.A. Armas accepted the offer and canceled his original birthday plans.

On the evening of July 29 (the evening of the murder), Armas went to a barbeque at his cousin's house. Alfonso was there; he was wearing a dark T-shirt. On Snapchat, Armas saw pictures of Pricilla in Banuelos's bathroom and "in the living room with [] multiple people." Armas could tell Pricilla had been drinking. He asked Pricilla where she was and if she had A.A. with her. Pricilla responded saying she was at her family's

9

house.  Regarding A.A., Pricilla told Armas "it's none of [his] business."  Armas had previously witnessed Pricilla intoxicated while with A.A.  Armas discussed the situation with Alfonso, and Alfonso "mentioned that [they] should check to see if [A.A.] was [at Banuelos's apartment]."

Armas drove himself and Alfonso to Banuelos's apartment in Armas's mother's SUV.  Neither Armas nor Alfonso had a knife or gun.  Armas drove into a parking lot behind the apartment and saw Pricilla's car.  Armas did not stop in the parking lot, and neither he nor Alfonso cut Pricilla's tires.

After parking on the street, Armas and Alfonso walked up to Banuelos's apartment and heard loud music playing.  Armas's right (dominant) arm was in a sling, and he was wearing a gray sweater and jeans.  Armas knocked on the door for "[a]bout 30 seconds, probably less."  The door opened quickly, and Pricilla "charge[d] at" Armas "in a rage" and pushed him "into the . . . front walkway."  Armas "slid[] [his] arm out of [his] sling," tried "scooting [Pricilla] to the side," and asked where A.A. was.  Armas denied that he hit Pricilla in her face.

Armas then entered the apartment to see if A.A. was there.  He had no intent to assault anyone at that time.  Armas saw Flores and two men whom Armas did not then recognize.[10]  Armas asked Flores where A.A. was.  Flores screamed and cursed at Armas, telling him to mind his own business and get out.  Within about five seconds, Denova "pick[ed] [Armas] up by the back of [his] knees," causing Armas to fall on his back.  Denova then "mount[ed] [Armas] with his knees over [] [Armas's] waist and beg[an] to punch" Armas.  At the same time, Garcia kicked Armas.  Flores punched Armas with his right hand while holding a knife in his left hand.

---

[10] Armas testified that he had not previously met Denova.  On cross-examination, Armas admitted he had once seen Denova at a skate park when Armas picked up Flores, but "[i]t was just a glance."

10

Eventually, Flores dropped the knife and hit Armas with both fists. Armas testified, "And at that point, I realized I'm getting beat really badly, and I picked up the knife." He held the knife in his right hand by the hilt with the blade pointing upward. When asked what he did with the knife, Armas said, "The knife was about . . . less than a foot away, and [I] picked it up and I started wielding it. I don't recall, it all happened fairly quick."[11] Armas intended to "fend them off from beating [him]." At this point, less than a minute had elapsed since Armas had entered the apartment, and Armas had been beaten for "probably about 30 seconds." Denova, Flores, and Garcia then "backed up." Armas dropped the knife where he was lying and exited the apartment. Armas testified that, during the incident, he did not suffer any cuts to his hand. But he bled from his nose and eyebrow and "maybe" "had a busted lip too."

Armas testified that he could not "recall if [he] spe[e]d-walked or . . . staggered" away from the apartment. He then drove to Alfonso's house, wiped the blood from his face with his gray sweater, went home, took a shower and pain medication, and went to sleep. At that point, Armas did not have any idea what, if any, injuries Denova had sustained. Later that morning, after conversations with a friend, Armas learned that Denova had died. Armas was in "[u]tter disbelief." At his friend's suggestion, Armas visited his father's grave and then went to his uncle's home "to be around family."

Armas arranged to meet his mother at a hotel in downtown San Jose. During his trip downtown, Armas believed he was under surveillance. He got out of the car he was in and went to his uncle's house by bus. Armas then drove his car to get some food. A friend whom Armas had called (who was then living in Hollister) picked Armas up. The friend took Armas to a house in Hollister, where Armas stayed for about two weeks. The friend eventually drove Armas to his godmother's house in San Jose, where Armas was

---

[11] In response to a question posed by the trial court, Armas said he believed the knife was a kitchen knife and that there "was a possibility it wasn't even a kitchen knife."

arrested by the police. Armas saw the police running toward him, tried to jump over a fence, and cut his hand in the process.

> b. Cross-Examination

On cross-examination regarding the August 2012 incident that resulted in Armas's first domestic violence conviction, Armas said he had been drinking at that time, but he denied that he had slapped Pricilla and shoved her face into a fence. Instead, he "believe[d] [he] stiff-armed" Pricilla, causing a bruise to her face. As for the incident that occurred in December 2013, Armas admitted that he had hit Pricilla down to the ground, but he denied kicking her.

Regarding the current offense, Armas said that he did not intentionally kill Denova. Early in the prosecutor's cross-examination, Armas agreed that he intentionally drove the knife into Denova's upper torso while "trying to get whoever was on top of [himself] away from [him]." Later in the cross-examination, Armas said he "tried to defend [himself] by wielding [the knife]" and his "intention wasn't to stab no one [*sic*]." Instead, he "was just trying to get them off [him]." Armas also testified, "I wasn't intending to put [the knife] in [Denova]. It just -- it just happened. . . . I was trying to back up from being under his knees with him being mounted over me. I believe that's when it happened."

Armas denied knowing that Pricilla and Denova were having sexual relations. Armas said he only knew—based on what Flores had told him—that Pricilla and Denova were " 'talking' " or flirting. But Armas admitted thinking that sexual relations were "a possibility." Armas testified that he was not jealous and "didn't care" about Pricilla and Denova having a romantic relationship, "[a]s long as it didn't involve [A.A.]" But Pricilla "was giving [Armas] mixed signals, because she was still seeing [him] intimately and things of that nature." Armas said he was "hurt" that Pricilla was starting a relationship with someone else, but he too "was in a relationship of [his] own." Armas denied that he ever threatened Denova during conversations with Pricilla.

12

On July 26 (four days before Denova was killed), Armas sent several text messages to Pricilla, including one that read:  " 'It's so sad why you're so quick to reply and jump for any other random ass guy.' "  Pricilla did not reply to Armas's texts that were not about A.A.

On the evening of the murder (July 29-30), Armas drank alcohol at the barbeque. He was "buzzed" and had drunk approximately 10 beers by 2:00 a.m. on July 30.  Armas was "irritated that [Pricilla] was beating around the bush and not telling [him] where [his] daughter was."  Armas testified that A.A.'s wellbeing was his only concern that evening.

Armas saw Pricilla's "storyline" on Snapchat, but he did not see the photo of Pricilla and Denova kissing in the apartment.  Armas also did not see any pictures of A.A., and he knew that Pricilla usually dropped A.A. off at her mother's house when she went out to socialize.  Armas testified further that he did not know Denova was at Banuelos's apartment that night, though he knew Denova and Flores were friends. Armas said he had "cut [Flores] out of [his] life" because Flores was "hanging out with her" and "contributing to Pricilla's behavior" (i.e., her drinking).

At 9:30 p.m. on July 29, Armas sent a message to Pricilla saying:  " 'I'm a fuck a bitch tonight for you.' "  Just after midnight on July 30, Armas sent additional messages to Pricilla:  " 'Watch, bitch, you stupid ass whore,' " and " 'Don't hit me up for shit, you fucking groupie.' "  Armas agreed that he was upset with Pricilla at that time, but he denied that it was because of what she was doing with Denova.  Armas said he called Pricilla names like "whore" "because [he] felt that it wasn't an appropriate time, her having the baby and going around doing the things she was doing."

At 12:20 a.m. on July 30, Armas sent more messages to Pricilla:  " 'I seen [*sic*] your snap' " (i.e., a Snapchat post) and, " 'Just watch, bitch.  Steven [Flores] and that bitch (Banuelos) think they're sick.  Just watch, you whore.' "  At 12:55 a.m., Armas sent another message to Pricilla:  " 'lying ass bitch at [Banuelos]'s.  Just watch.  I'm with my family.  Like always with your whore ass.  Just member [*sic*] me and [Flores] trained her

13

there.  Ha-ha, dumb bitch, LOL.' " Armas acknowledged that he was angry "[i]n a sense" when he sent this message, but he maintained that it "stem[med] from [him] not being [] able to see [A.A.]"  A minute later, Armas sent another message:  " 'She sucked my dick on that couch you're sittin' [*sic*] on, uh-uh.' "

Armas denied that he was angry when he went to Banuelos's apartment; rather he was "irritated" and only "[p]artially angry."  While at the front door, Armas "wanted to see if [A.A.] was in [the apartment]" and "wanted to ask [Pricilla about A.A.], but the way Pricilla went about charging [him]" he "never even got a chance to have a conversation with her because she became hysterical and tried clawing [him]."  Armas denied that he or Alfonso said " 'Come outside, you fucking pussy.  I'm going to kill you.' "  Armas explained that "[w]hatever [the neighbors] feel they heard might have been said once the door was opened, but it wasn't from me."

Armas testified that he and Alfonso did not go to the apartment with the "mentality" that there was "a beef or a fight."  When asked if he could explain why he "had [made] numerous phone calls to Alfonso Macias immediately before and immediately after Mr. Denova was killed," Armas said "No," and speculated "I could have went [*sic*] to the store."  Armas explained that Alfonso "wanted to go with [Armas] because [Alfonso] has a child of his own.  He's familiar with A.A.  He cares for [Armas].  He just wanted to be there to support [Armas]."  After the incident, Alfonso was not upset with Armas, rather "he was more worried."  Alfonso did not yell " 'I'm going to fucking kill you' " as they ran from the apartment.

Armas coincidentally after Denova's death left town to go to Hollister for a couple of weeks to stay with his friend, even though Armas knew he had stabbed Denova and was scared of being arrested.  As for why Armas did not turn himself in, he said, "I was scared.  I -- I don't know.  I can't really explain why.  I was just panicked.  I was just scared of everything that happened."

14

## II.  DISCUSSION

Armas raises three claims of error.  He contends the trial court erred by instructing the jury with CALCRIM No. 3472 ("Right to Self-Defense:  May Not Be Contrived").  He further argues that the trial court erroneously imposed a protective order, under section 136.2, upon non-qualifying misdemeanor convictions.  Finally, Armas asserts that, if this court does not reverse his murder conviction, it should order a limited remand for a hearing regarding his youth under *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*).

A.  *Instruction with CALCRIM No. 3472*

Armas contends the trial court breached its sua sponte duty and violated his constitutional rights to due process and to present a defense by instructing the jury with CALCRIM No. 3472 that he had no right to self-defense if he provoked a fight or quarrel to create an excuse to use force.  Armas maintains the instruction "misstated the law on the facts of this case" because, "[i]f Armas's intent was to use only non-deadly force, and the response was with deadly force, Armas regained the right to use self-defense to protect himself against such unlawful use of deadly force by those inside the apartment."  Armas asserts the error was prejudicial under any standard and this court should vacate his murder conviction and the attendant weapon-use enhancement.  Alternatively, Armas argues that, if this court concludes his claim was forfeited by a lack of objection at trial, we should consider the merits of the claim as an exercise of our discretion or based upon ineffective assistance of counsel.

The Attorney General counters that Armas forfeited his instructional error claim when he failed to request the "pinpoint modification" at issue in his claim.  Further, the Attorney General contends that Armas has not demonstrated his trial counsel performed deficiently when he failed to request the pinpoint modification and, regardless, Armas has not shown he was prejudiced by any purported deficient performance.

15

### 1. Additional Background

When the parties and the trial court discussed the jury instructions on the record following the close of evidence, the court characterized the defense theory as self-defense and said "the defense is getting a self-defense instruction" (which it had requested).[12] The court said further that in its packet of proposed instructions, following CALCRIM No. 505 (self-defense for homicide), it "put in [CALCRIM No.] 3471, which is the generic instruction about mutual combat and starting a fight. [CALCRIM No.] 3472. And then the [CALCRIM No.] 510 instruction [regarding accidental killing] that we've just talked about. I don't believe there was anything controversial about that that we haven't already addressed." The parties did not take issue with the trial court's statement.

Ultimately, in accord with its prior statements, the trial court instructed the jury on count 1 regarding self-defense (using CALCRIM No. 505); the meaning of great bodily injury (using language from CALCRIM No. 3160); self-defense in the context of mutual combat or when the defendant starts a fight (using CALCRIM No. 3471); and that self-defense is unavailable if contrived (using CALCRIM No. 3472). Furthermore, the court instructed the jury with various CALCRIM instructions regarding murder (including first degree murder under two theories, namely, a felony burglary/attempted burglary murder theory and a premeditation and deliberation theory), voluntary manslaughter (under two theories, heat of passion and imperfect self-defense), involuntary manslaughter, and voluntary intoxication. The burglary instruction for the felony murder theory stated that "[a] burglary was committed if the defendant entered with the intent to commit Domestic Violence with Injury upon [Pricilla G.] or intended to commit Assault with a Deadly Weapon upon Ulises Omar Denova."

---

[12] The parties and court had previously discussed the jury instructions off the record, apparently for several hours.

CALCRIM No. 3472, as given, read: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."

Similarly, the imperfect self-defense instruction for voluntary manslaughter (under CALCRIM No. 571) told the jury that "[i]mperfect self-defense does not apply when the defendant, through his own wrongful conduct, has created circumstances that justify his adversary's use of force."

In addition, the instruction under CALCRIM No. 3471 provided that a defendant who engaged in mutual combat or started a fight had a right to self-defense if his opponent continued to fight after the defendant (1) "actually and in good faith tries to stop fighting," (2) "indicates, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wants to stop fighting and that he has stopped fighting," and (3) "gives his opponent a chance to stop fighting." "However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting, communicate the desire to stop to the opponent, or give the opponent a chance to stop fighting."

In his closing argument, the prosecutor contrasted felony murder with premeditated and deliberate murder, telling the jury that "once you find [Armas] guilty under a felony murder theory, it's first-degree murder. You don't have to consider self-defense whatsoever."[13] In the same vein regarding felony murder, the prosecutor argued, "if you show up at 2:00 a.m. and you're banging on someone's door, and you push your way in and you have the intent to knock your girlfriend around or if you have the intent to

---

[13] In accord with the prosecutor's argument, the trial court instructed the jury: "Provocation, heat of passion, and/or self-defense do not apply to a prosecution under a theory of felony murder."

17

feloniously assault someone inside and you enter with that intent in your head, guess what?  You don't get to claim self-defense.  You don't get to say:  Oh, they attacked me, so I had to kill.  I had to stab Mr. Denova in the chest.  I didn't have any choice.  [¶]  No.  The law does not permit that."  The prosecutor acknowledged that "[u]nder other circumstances . . . there could be a self-defense claim," but he reiterated "you are not allowed to use self-defense" in the context of felony murder.

Later in his argument, the prosecutor directly addressed Armas's claim of self-defense and discussed Armas's testimony.  The prosecutor said, "I'm just going to flat-out say [Armas's testimony] was a complete lie.  That's what all of the other evidence tells us.  This was a premeditated murder.  He showed up with a knife and had the intent to kill."

Focusing the jurors' attention on "the malice variety of murder," the prosecutor quoted from the general self-defense instruction (CALCRIM No. 505) to assert:  "Now, even assuming you give credit to the defendant's testimony, which you shouldn't, this instruction is included:  'The defendant used no more force than was reasonably necessary.' "  The prosecutor then maintained, "You don't get to show up drunk at 2:00 o'clock in the morning, force your way in when you're looking to start trouble, you're angry at your ex, and then say, 'Oh, I -- I -- I had to use self-defense.'  No.  You don't get to bust your way into somebody else's home, somebody else's residence, . . . that's their house."  The prosecutor argued further that "even crediting, for a moment, [Armas's] version, . . . [t]hey see him throw Pricilla to the ground. . . . They had the right to use force on him.  I don't believe that happened for a minute.  [¶]  But just think about -- from their perspective -- think about what the defendant is saying.  Well, he . . . pushed his way in after Pricilla opened the door, and then he had to stab Mr. Denova in the heart.  [¶]  And what a coincidence. . . . Oh, he's getting attacked by these three guys.  The one who ends up with a hole in his heart is the one who's dating his girlfriend and [who] they're both simultaneously having sex with.  What a shock."  The prosecutor continued,

18

"You don't get to use self-defense if you provoke a fight. Basically, you don't get to roll in all hot under the collar [] and bang on the door [] and with a head full of steam and provoke a fight with the intent to create an excuse to use force. 'Oh, well, I had to stab him.' "

In response, Armas's trial counsel argued that the jurors "obviously . . . heard two totally different scenarios." Counsel explained that the prosecution was using its version of the incident to argue for felony murder and premeditated and deliberate murder. By contrast, the defense was arguing for "justifiable self-defense," based on Armas's testimony that he "loves his daughter and was very concerned about her environment and says he could not learn from Pricilla [A.A.]'s whereabouts. He and his . . . very good friend, Alfonso, decide to go over and find out." Counsel emphasized that "[t]he whole prosecution in this case rests on [Armas] entering the apartment with a knife." Counsel maintained that Flores had "no credibility" and was the only witness who "ever puts a knife in [Armas]'s hand." Counsel further asserted that the group of friends "all lied." Counsel argued, "It's a big lie. It's a serious lie. And they got together, and it was a cover story. And the whole motive behind it had nothing to do with fear [of Armas]. . . . [¶] They cooked it up to cover [for] [Flores]. And they had to cover [Flores] because he's the one that brought the knife into the living room, which was the instrument that resulted in the death of [Denova]."

Regarding self-defense, trial counsel said, "It all comes back to the word 'reasonable,' as so much does in life, in both criminal and civil situations." After reading a portion of the general self-defense instruction (CALCRIM No. 505), counsel remarked, "Defendant's not required to retreat, but I don't believe that is applicable here." Counsel argued that there was no "serious question as to whether [Armas] received a beating of some sort in the apartment." In addition, counsel asserted that Flores's testimony about the stabbing (as compared to Armas's testimony) was not consistent with Denova's wounds and abrasions.

19

After describing the defense's version of the incident, trial counsel returned to the concept of reasonableness for self-defense. Counsel asked rhetorically, "was it reasonable for [Armas] to pick up the knife and defend himself by lashing out with it, or should he have just accepted whatever was going to come?" Counsel "suggest[ed] most men, if assaulted by three drunk males, who are using fists and feet, would pick up the knife and defend themselves. And it's very unfortunate what happened in this case. But the question is[,] is it reasonable to pick up the knife at that point."

On their second day of deliberations, the jurors found Armas not guilty of first degree murder but guilty of second degree murder.

### 2. Legal Principles

" 'In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case.' [Citation.] That duty extends to instructions on the defendant's theory of the case, 'including instructions "as to defenses ' "that the defendant is relying on . . ., or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." ' " ' " (*People v. Townsel* (2016) 63 Cal.4th 25, 58 (*Townsel*).) Moreover, "[e]ven if the court has no sua sponte duty to instruct on a particular legal point, when it does choose to instruct, it must do so correctly." (*People v. Castillo* (1997) 16 Cal.4th 1009, 1015; see also *Townsel*, at p. 58.)

A claim of instructional error is subject to our independent review. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "When an appellate court addresses a claim of jury misinstruction, it must assess the instructions as a whole, viewing the challenged instruction in context with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner." (*People v. Wilson* (2008) 44 Cal.4th 758, 803; see *People v. Jablonski* (2006)

37 Cal.4th 774, 831.) "We of course presume 'that jurors understand and follow the court's instructions.' " (*Wilson*, at p. 803.)

Regarding self-defense, "CALCRIM No. 3472 is generally a correct statement of law, which might require modification in the rare case in which a defendant intended to provoke only a non-deadly confrontation and the victim responds with deadly force." (*People v. Eulian* (2016) 247 Cal.App.4th 1324, 1334 (*Eulian*); see also *id*. at p. 1333 [citing *People v. Enraca* (2012) 53 Cal.4th 735, 761 (concluding that an analogous CALJIC instruction was supported by the evidence in the record)]; *People v. Ramirez* (2015) 233 Cal.App.4th 940, 947 (*Ramirez*).)

Furthermore, "[t]he doctrine of imperfect self-defense cannot be invoked []. by a defendant whose own wrongful conduct (for example, a physical assault or commission of a felony) created the circumstances in which the adversary's attack is legally justified." (*People v. Booker* (2011) 51 Cal.4th 141, 182; see *In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1.) However, "the defense is available when the victim's use of force against the defendant is unlawful, even when the defendant set in motion the chain of events that led the victim to attack the defendant." (*People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1179–1180.)

### 3. Analysis

We begin our analysis of Armas's claim by addressing the issue of forfeiture. Relying on *Ramirez*, *supra*, 233 Cal.App.4th at p. 949, Armas contends that we should consider his claim despite his lack of objection in the trial court to the giving of CALCRIM No. 3472. He argues that his appellate claim concerns "whether giving [CALCRIM No.] 3472 was accurate under the facts here" and affected his "substantial rights" under section 1259.[14]

---

[14] Section 1259 provides, in relevant part, that an appellate court "may . . . review any instruction given, refused or modified, even though no objection was made thereto in

21

The Attorney General disputes Armas's contention and maintains that, notwithstanding the trial court's sua sponte duty to instruct on a defendant's theory of the case, Armas's claim concerns a "proposed modification to CALCRIM No. 3472" that he was obligated to request. Further, the Attorney General asserts that *Ramirez* is inapposite because it is factually distinguishable from the present case.

At trial, Armas did not object to any of the self-defense instructions provided to the jurors. On appeal, Armas contests only the instruction under CALCRIM No. 3472, which was provided without any modification to account for the facts presented to the jury. He does not challenge any of the other self-defense instructions, including the general self-defense instruction he requested (CALCRIM No. 505) or the instruction on mutual combat/initial aggression (CALCRIM No. 3471).

"A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal." (*People v. Lee* (2011) 51 Cal.4th 620, 638; see also *People v. Covarrubias* (2016) 1 Cal.5th 838, 873–874, 901; *People v. Bolin* (1998) 18 Cal.4th 297, 326.) Armas characterizes his claim as one challenging CALCRIM No. 3472 as an incorrect statement of law under the facts. We conclude, however, the claim is appropriately viewed as complaining about an instruction that was incomplete in light of the evidence and thus should have been modified. Accordingly, Armas's failure to object to or request modification of an otherwise correct jury instruction forfeited his current claim of error.

Nevertheless, "[w]e may review defendant's claim of instructional error, even absent objection, to the extent his substantial rights were affected." (*Townsel*, *supra*, 63 Cal.4th at pp. 59–60; § 1259; see also *People v. Mitchell* (2008) 164 Cal.App.4th 442,

the lower court, if the substantial rights of the defendant were affected thereby." (§ 1259.)

22

465 [" 'Substantial rights' are equated with errors resulting in a miscarriage of justice under *People v. Watson* [(1956)] 46 Cal.2d 818."])  In light of these principles and the centrality of self-defense to Armas's case, we will consider his claim on its merits.[15]  (See *People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.)

Regarding the merits, Armas relies on *Ramirez* to assert that CALCRIM No. 3472 was not an accurate statement of the law on these facts.[16]  Armas argues that the "instruction made no exception for the scenario where the jury finds that Armas acted only with intent to use non-deadly force when Armas forced his way into Banuelos's apartment, but Denova (the victim), Flores, and Garcia responded with deadly force by administering a group beating to Armas."  Armas maintains that this "is largely the version of the events Armas testified to at trial" and, although "Armas denied the intent to assault anyone when he entered the apartment, the jury was free to decide which parts of his testimony to believe" and the prosecutor advanced the theory that "Armas entered the apartment with the intent to assault [Pricilla]."  Armas further asserts that the prosecutor's argument and the imperfect self-defense instruction reinforced the flaw in CALCRIM No. 3472 as given.

We are not persuaded by Armas's argument that the trial court erred under *Ramirez* because that case is materially distinguishable.  In *Ramirez*, a divided panel of the Fourth District Court of Appeal, Division Three addressed a challenge to CALCRIM No. 3472.  In that case, the jury returned first-degree murder convictions against two brothers who were involved in a gang-related fight that culminated in the shooting death of a rival gang member.  (*Ramirez*, *supra*, 233 Cal.App.4th at pp. 943–945.)  The

---

[15] Because we address the merits of Armas's instructional claim, we do not address Armas's alternative claim of ineffective assistance of counsel.

[16] We note that Armas does not assert that no substantial evidence supported the instruction or that the prosecutor committed any misconduct in argument.  Instead, akin to *Ramirez*, Armas contends that, based on the evidence and argument, the instruction improperly foreclosed the jury from relying on his theories of self-defense or imperfect self-defense.

defendants (Victor and Armando) and a third member of their gang (friend) drove to an apartment complex hoping to find a rival gang member with whom Victor and Armando had a personal connection and who previously had interceded upon Victor's request to stop the rival gang's harassment of them. (*Id.* at p. 944.) The friend believed they "were just gonna fight," and Armando brought a gun knowing the rival gang members carried weapons but he "did not set out intending to shoot anyone." (*Ibid.*) At the apartment complex, the trio encountered about seven or eight members of the rival gang. A fight ensued during which Armando pulled out his gun and fatally shot one of the rival gang members. (*Id.* at pp. 944–945.)

There was evidence at trial that Victor and Armando had asked to no avail about the rival gang member they knew, and there was conflicting evidence whether a rival gang member or the trio were the initial aggressors. (*Ramirez*, *supra*, 233 Cal.App.4th at p. 944.) Armando testified that, when the fight broke out, Victor and the friend were "double-teamed" by rival gang members. (*Id.* at p. 945.) Armando saw the victim approach and raise his hand holding something black that looked like a gun. Armando pulled out his gun and shot the victim. (*Ibid.*) Other than Armando's testimony, no evidence showed the victim or any other rival gang member had a gun. Armando claimed he acted in self-defense and to defend his companions. (*Ibid.*) The defense was focused on Armando's regained right of self-defense (as either an initial aggressor or mutual combatant) if he honestly believed the victim suddenly and unjustifiably escalated the fistfight to a gun fight. (*Id.* at pp. 946, 948.)

The Court of Appeal in *Ramirez* acknowledged that CALCRIM No. 3472 "states a correct rule of law in appropriate circumstances." (*Ramirez*, *supra*, 233 Cal.App.4th at p. 947.) But the court reversed the defendants' convictions, concluding the instruction misstated the law on the facts of the case because "[t]he instructions and the prosecutor's argument established as a matter of law that defendants were not entitled to imperfect

24

self-defense if they contrived to use *any* force, even nondeadly force, but that was a question for the jury to decide on its own evaluation of the facts." (*Id*. at p. 953.)

In the present case, by contrast to *Ramirez*, Armas claimed unequivocally that he went to and entered Banuelos's apartment unarmed and only to locate his infant daughter. He testified that he had no intent to assault anyone at the apartment and, in fact, did not hit anyone. Rather, he simply picked up a knife after Flores dropped it and stabbed Denova after they violently attacked him. Further, consistent with Armas's version of events, his trial counsel argued that "retreat" was inapplicable in this case, signifying that the incident was not one in which Armas had started a non-deadly fight or engaged in mutual combat. Trial counsel framed the case as involving "two totally different scenarios": Armas's version in which he acted reasonably in self-defense when he picked up the knife during a beating initiated by others, versus the prosecution's scenario in which Armas entered the apartment with a knife. Armas's trial counsel challenged the latter scenario as faulty because it relied on uncredible witnesses who were motivated to lie about what had happened.

Trial counsel did not suggest in his closing argument that Armas provoked a nonlethal fight (as a pretext or otherwise) or that Denova, Flores, or Garcia unjustifiably escalated a fight using deadly force, thereby reviving Armas's right to self-defense. Instead, Armas's defense rested on the assertion that Denova (joined by Flores and Garcia) initiated a potentially deadly confrontation and Armas reacted reasonably with deadly force intending only to "fend" off the beating. Moreover, although the prosecutor noted CALCRIM No. 3472 when arguing that self-defense does not "apply when you do things like the defendant did," the prosecutor also urged the jurors to reject Armas's version of events entirely, as a "complete lie," and noted that for self-defense to apply, Armas could not use more force than was reasonably necessary.

Although the jury rejected the prosecution's claim that Armas was guilty of first degree murder (which under the jury instructions required finding that Armas entered the

25

apartment with the intent to commit domestic violence on Pricilla or to commit assault with a deadly weapon on Denova), the parties here principally staked positions that urged the jury to choose between two distinct scenarios: one in which Armas possessed a knife when he arrived at the apartment intending to use unprovoked lethal force, and another in which Armas did not possess a knife or attack anyone and only sought to check on his daughter's wellbeing. According to the defense account, Armas picked up the knife only after Flores dropped it after attacking Armas in the first instance.

Simply put, no party contended that Armas intended to precipitate a non-deadly confrontation which escalated into deadly force due to the actions of the other participants. For these reasons, *Ramirez* is inapposite, and this was not "the rare case in which a defendant intended to provoke only a non-deadly confrontation and the victim responds with deadly force." (*Eulian*, *supra*, 247 Cal.App.4th at p. 1334.)

For these reasons, we conclude that the giving of CALCRIM No. 3472 under these facts was not error, and the jury instructions, taken as a whole, amply and properly addressed Armas's self-defense claim. Therefore, Armas's substantial rights were not affected by the challenged jury instruction.

B. *No-Contact Protective Order*

Armas asserts the trial court lacked authority to impose a protective order for Pricilla G. at his sentencing. Armas contends that neither of his misdemeanor convictions—for violation of section 243, subdivision (e) (count 2) and section 166, subdivision (c)(1) (count 3)—is a qualifying crime for issuance of a protective order under section 136.2, subdivision (i). Further, Armas maintains that erroneous imposition of a protective order amounts to an unauthorized sentence that this court can correct despite his lack of objection in the trial court. The Attorney General responds that Armas's conviction for battery authorizes imposition of the protective order because Family Code section 6320 "expressly allows a court to enjoin the 'battering' of a protect[ed] party."

26

We agree that Armas can raise his claim for the first time on appeal. (See *People v. Robertson* (2012) 208 Cal.App.4th 965, 995–996.) Nevertheless, Armas has not persuaded us that the trial court lacked authority to issue the protective order.

Section 136.2, subdivision (i)(1), provides, in pertinent part, that when "a criminal defendant has been convicted of a crime involving domestic violence as defined . . . in Section 6211 of the Family Code, . . . the court, at the time of sentencing, shall consider issuing an order restraining the defendant from any contact with a victim of the crime." In turn, Family Code section 6211 defines "[d]omestic violence" as "abuse perpetrated against" a "former cohabitant" or a "person with whom the respondent has had a child." (Fam. Code, § 6211, subds. (b), (d).) Further, the term "abuse" in Family Code section 6211 "means any of the following: [¶] (1) To intentionally or recklessly cause or attempt to cause bodily injury. [¶] (2) Sexual assault. [¶] (3) To place a person in reasonable apprehension of imminent serious bodily injury to that person or to another. [¶] (4) To engage in any behavior that has been or could be enjoined pursuant to Section 6320. [¶] (b) Abuse is not limited to the actual infliction of physical injury or assault." (Fam. Code, § 6203.) Finally, Family Code section 6320, subdivision (a), provides, in pertinent part, that a court may "enjoin[] a party from . . . battering . . . the other party." (Fam. Code, § 6320, subd. (a).)

On count 2, the jury convicted Armas under section 243, subdivision (e)(1), of misdemeanor battery on a person who is the parent of his child. Battery is defined in the Penal Code as "any willful and unlawful use of force or violence upon the person of another." (§ 242.) The trial court instructed the jury, in relevant part, that the People had to prove that Armas "willfully and unlawfully touched Pricilla [] in a harmful or offensive manner" and "did not act in self-defense." The court further instructed the jury that "[t]he slightest touching can be enough to commit a battery if it is done in a rude or angry way. . . . The touching does not have to cause pain or injury of any kind."

Armas argues that the term "battering" in Family Code section 6320, subdivision (a), does not encompass the conduct prohibited by the misdemeanor battery statute. Rather, he contends " 'battering' " should be interpreted based on its common dictionary meaning and "that term requires physical striking of someone with intent to cause injury or pain."

"Statutory interpretation is a question of law subject to de novo review. [Citation.] When construing a statute, we strive to ascertain and effectuate the Legislature's intent." (*People v. Johnson* (2020) 50 Cal.App.5th 620, 632.) " 'Because the statutory language is generally the most reliable indicator of that intent, we look first at the words themselves, giving them their usual and ordinary meaning.' " (*People v. Ruiz* (2018) 4 Cal.5th 1100, 1105.) "In divining a term's 'ordinary meaning,' courts regularly turn to general and legal dictionaries." (*De Vries v. Regents of University of California* (2016) 6 Cal.App.5th 574, 591.) Further, "[o]ne source for the usual, ordinary meaning of the term might be other statutes." (*Grayson Services, Inc. v. Wells Fargo Bank* (2011) 199 Cal.App.4th 563, 573.) " 'If the statutory language is unambiguous, then its plain meaning controls. If, however, the language supports more than one reasonable construction, then we may look to extrinsic aids, including the ostensible objects to be achieved and the legislative history.' " (*Ruiz*, at p. 1106.)

"Battering" in Family Code section 6320, subdivision (a), is a gerund, or -ing form of the verb, "batter." Merriam-Webster defines "batter" (in law) as "to commit battery against another : to offensively touch or use force on a person without the person's consent." (Merriam-Webster Dict. Online (2021).)[17] Similarly, in Black's Law Dictionary, the definition of the noun "battery" notes the verb form "batter." (Black's Law Dict. (11th ed. 2019).) Battery is defined in Black's Law Dictionary (for criminal law purposes) as "[t]he nonconsensual touching of, or use of force against, the body of

---

[17] <https://www.merriam-webster.com/dictionary/batter> [as of May 25, 2021], archived at: <https://perma.cc/YWH3-FNVT>.

28

another with the intent to cause harmful or offensive contact." (Black's Law Dict. (11th ed. 2019).) Further, for tort purposes, battery is defined as "[a] nonconsensual, intentional, and offensive touching of another without lawful justification, but not necessarily with the intent to do harm or offense as required in a criminal battery." (Black's Law Dict. (11th ed. 2019).) These definitions accord with our state's misdemeanor battery statute. (See *People v. Myers* (1998) 61 Cal.App.4th 328, 335 [quoting *People v. Rocha* (1971) 3 Cal.3d 893, 899–900, fn. 12]; *People v. Martinez* (1970) 3 Cal.App.3d 886, 889.)

Our task in the present case involves ascertaining and effectuating the Legislature's intent with respect to enjoining a person from "battering," and we must do so in view of the Legislature's statement that "[a]buse is not limited to the actual infliction of physical injury or assault." (Fam. Code, § 6203.) In our view, based on the text of Family Code section 6320, subdivision (a), the plain meaning of the term "battering" is unambiguous. Further, we conclude that "battering" is properly understood according to the common legal definitions of "batter" and "battery," rather than the ordinary nonlegal meaning. That is, under Family Code section 6320, subdivision (a), when a court enjoins a person from "battering" another, the court precludes the person from willfully and unlawfully touching another person in, at least, "a rude or angry way." (See CALCRIM No. 960 ["Simple Battery"]; see also *Phillips v. Campbell* (2016) 2 Cal.App.5th 844, 852.) Because Armas was convicted of such conduct in count 2, we conclude the trial court had the authority under section 136.2 to issue against Armas a 10-year, no-contact criminal protective order protecting Pricilla.

C. *Request for a* Franklin *Hearing*

Armas was 22 years old when he murdered Denova. In February 2018, the trial court sentenced Armas to an indeterminate term of 16 years to life in prison. Hence, Armas will be entitled to a youth offender parole hearing during his 20th year of incarceration. (§ 3051, subd. (b)(2).)

29

In 2016, the California Supreme Court decided *People v. Franklin*, *supra*, 63 Cal.4th 261. In *Franklin*, our high court "held that when a juvenile offender receives an indeterminate life sentence, the offender must be 'given adequate opportunity at sentencing to make a record of mitigating evidence tied to his youth.' [Citation.] The case was remanded to the trial court 'for the limited purpose of determining whether [the offender] was afforded an adequate opportunity to make a record of information' relevant to his eventual youth offender parole hearing." (*People v. Medrano* (2019) 40 Cal.App.5th 961, 967 (*Medrano*).)

Armas argues that we should remand his case under *Franklin* so that he can generate a record for his eventual youth offender parole hearing. Armas acknowledges that he did not request such a hearing at the time of his sentencing. Nevertheless, he contends the trial court had a sua sponte duty to hold such a hearing and the hearing could not be "waived through silence."

The Attorney General, relying on *Medrano*, contends that Armas's failure to request a hearing at the time of his sentencing forfeited his current claim. The Attorney General further notes that, despite the forfeiture, Armas has an alternate remedy, in that "[h]e may still file a motion under section 1203.01 to make a record for a future youth offender parole hearing."

Armas fails to persuade us that *Medrano* should be rejected. In that case, the Court of Appeal decided, when "[t]he record does not indicate that [the offender's] opportunity to exercise th[e] right [to present mitigating youth-related evidence at sentencing] was inadequate in any respect," (*Medrano*, *supra*, 40 Cal.App.5th at p. 967) the appropriate remedy is to "affirm without prejudice to [the offender's] filing a motion 'for a *Franklin* proceeding under the authority of section 1203.01' and [*In re Cook* (2019) 7 Cal.5th 439 (*Cook*)]." (*Medrano*, at p. 968.)

In the present case, after the jury reached its verdict, the trial court referred the matter to the probation department "for a full report." But Armas declined to be

interviewed by the probation officer, and the probation report lacks any mitigating information relating to Armas's youth.  (See §§ 3051, 4801.)  In addition, at Armas's sentencing hearing, his trial counsel submitted no sentencing memorandum or any other information or testimony relevant to a future youth offender parole hearing.  Such a hearing was never mentioned.

As in *Medrano*, the record does not indicate that Armas "was not given an adequate opportunity to make a record of mitigating youth-related evidence as contemplated in *Franklin*."  (*Medrano*, *supra*, 40 Cal.App.5th at p. 967.)  "Rather, it appears that he merely failed—whether by choice or by inadvertence—to exercise it." (*Ibid*.)  We agree with the *Medrano* analysis that "given the availability of the motion hearing described in *Cook*," there is "no basis to order the same relief that was granted in *Franklin*."  (*Id*. at p. 968.)  We further reject Armas's argument that the trial court had a sua sponte duty to hold a *Franklin* hearing.  Accordingly, we will not remand this matter and instead decide that Armas, if he so chooses, may seek a *Franklin* hearing in the trial court under section 1203.01.  (See *Medrano*, at p. 968.)

## III.  DISPOSITION

The judgment is affirmed without prejudice to Armas's filing a motion in the trial court for a *Franklin* proceeding under Penal Code section 1203.01.  (See *People v. Medrano* (2019) 40 Cal.App.5th 961, 968; *In re Cook* (2019) 7 Cal.5th 439, 458–460.)

31

_____
                                       Danner, J.

WE CONCUR:

_____
Greenwood, P.J.

_____
Grover, J.

**H045686**
***People v. Armas***