Filed 12/6/24  P. v. Fitzsimmons CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>MICHAEL EDWARD FITZSIMMONS,<br><br>　　Defendant and Appellant. | D081577<br><br><br>(Super. Ct. No. SCD290054) |

APPEAL from a judgment of the Superior Court of San Diego County, Joan P. Weber, Judge.  Affirmed.

Crowley and Crowley and Nate Crowley for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Assistant Attorneys General, Arlene A. Sevidal, Andrew Mestman and Susan Elizabeth Miller, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Michael Edward Fitzsimmons of animal cruelty (Pen. Code,[1] § 597, subd. (a); count 1), and carrying a loaded firearm on his person

---

[1]　　Undesignated statutory references are to the Penal Code.

(§ 25850, subd. (a); count 2).  As to count 1, the jury found true a deadly firearm use allegation.  (§ 12022, subd. (b)(1).)  The jury was also unable to reach a verdict on counts 3 and 4, alleging Fitzsimmons acted in contempt of a court order (§ 166, subd. (a)(4)); therefore, upon the People's motion, the court dismissed those counts.

The court sentenced Fitzsimmons to two years formal probation, requiring him to serve 365 days in the sheriff's custody, but permitting him to participate in a county parole and alternative custody program (CPAC).

In his appeal, Fitzsimmons contends that:  (1) the court's self-defense instruction with CALCRIM No. 3470 erroneously imposed a duty that he retreat, and limited his right to self-defense by requiring him to believe he or someone else was in danger of suffering imminent bodily injury; (2) he received ineffective assistance of counsel because counsel did not object to a self-defense instruction; (3) the court improperly joined the animal cruelty count with the contempt of court counts, and his counsel was ineffective for failing to object to a joinder or moving to sever the counts; and (4) his conviction for carrying a loaded firearm must be reversed because section 25850 violated his Second Amendment right to carry arms as interpreted by the United States Supreme Court in *New York State Rifle and Pistol Association, Inc. v. Bruen* (2022) 597 U.S. 1 (*Bruen*).  We affirm.[2]

FACTUAL AND PROCEDURAL SUMMARY

A.  *Prosecution Case*

---

[2]     In a companion petition for writ of habeas corpus (case No. D084148) which we considered with this appeal, Fitzsimmons raises some of the same issues.  He further contends his counsel provided ineffective assistance by failing to seek and obtain enhancement of a surveillance video.  We address the writ by separate order.

2

K.O. testified that she lived in a house next to a resort with her boyfriend, who owned the resort where she worked. Late on the night of March 15, 2021, her two dogs were unleashed in front of the resort. Fitzsimmons and his wife were walking on the boardwalk adjacent to the resort, and toward where the dogs were. One of K.O.'s dogs began to bark at them and K.O. yelled out to them multiple times saying that her dog would not hurt them. K.O. yelled again for the dog to come to her, but even though it started walking to her, he turned around and continued barking at the couple, who kept walking.

Suddenly, K.O. saw Fitzsimmons take a step toward her, "square up," extend his arms almost all the way out, and point a gun at her and her dog, from approximately five feet away. K.O. yelled, "What the fuck?" The dog, which was on the grassy section of the resort property, turned around and barked. Fitzsimmons fired the gun, shooting the dog in the head. The parties stipulated the dog was transported to an emergency veterinarian, who treated his gunshot wound on his face.

Police officers reviewed a surveillance video from the resort. An officer testified the video quality was "pretty good." He described the video as showing Fitzsimmons and his wife walking on the boardwalk. When the dog came into view, the muzzle flash of a gunshot was seen. The dog appeared to be facing the camera or turning towards the camera when the shot was fired.

An investigating police officer discovered that Fitzsimmons had a variety of firearms registered to him, but he lacked a concealed weapons permit for the City of San Diego, and no record showed he ever applied for one. The officer applied for a gun violence restraining order (GVRO) because Fitzsimmons had discharged a firearm illegally toward occupied hotel rooms and shot a dog in the face. On March 18, 2021, a judge granted the GVRO.

3

Three days later, when an officer tried to serve the GVRO, he learned Fitzsimmons was in Mexico.[3]  On April 11, 2021, Fitzsimmons and his wife returned to the United States.  A border patrol officer detained them at the international border, and notified the investigating police officer, who arrested Fitzsimmons.

Accompanied by Fitzsimmons, police searched his home for firearms and ammunitions.  At some point during their search, police were informed that "consent was taken away.  We were told to no longer search."  Police therefore had to obtain a search warrant because there were still outstanding firearms they had not located.  They found additional ammunition and magazines that Fitsimmons had not pointed out to them, and that finding formed the basis for the contempt charges.

B. *Defense Case*

Fitzsimmons testified he did not have a permit to carry the gun, which he bought because three weeks earlier he had been "jumped" while he was jogging on the boardwalk and afterwards he became concerned for his safety.  He placed the gun in a fanny pack that he carried with him on the walk that night.

With the aid of  surveillance video trial exhibits, Fitzsimmons and his wife testified they were walking on the boardwalk on the night of the incident.  They stopped to let the dog cross and then continued walking.  The dog was behind them on the grass.  The dog began barking in a threatening way and then lunged at Fitzsimmons.  Fitzsimmons estimated the dog was about five feet away from him.  He thought it was going to bite him, knock him down, or go after his wife.  When the dog lunged the third time, he shot

---

[3]     This GVRO expired before Fitzsimmons returned to the United States. The officer sought a new GVRO, which the judge granted on April 11, 2021.

4

the gun aiming at the grass. He was merely attempting to frighten the dog. He and his wife did not know the dog was injured, so they continued walking. A woman, later identified as K.O., came running after him and asked, "Why do you think you can hurt my dog?" He told her the dog had attacked him. He told his wife to go home, and then he ran away because he did not want a confrontation with K.O.

On redirect examination, the prosecutor asked Fitzsimmons: "You were asked if you would go in the opposite direction of where the dog was at or go down to the water's edge. Why did you not do that?" He replied, "I can't outrun a dog."

C. *Jury Instructions and Closing Arguments*

During a jury instruction conference, the prosecution requested the court instruct the jury on self-defense with CALCRIM No. 3470. The court asked defense counsel if he wished to be heard. Defense counsel agreed to minor edits of the instruction related to the claim Fitzsimmons was defending himself from a dog and not a person. The court stated the changed portion of the instruction would read, " 'Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of bodily injury to himself "or another." ' " Defense counsel responded, "Right. Okay. That's perfect." The court then clarified, "[Y]ou are not requesting any additional self-defense instructions, either side—is that correct?" Defense counsel and the prosecutor responded, "That's correct."[4]

---

[4] The court's CALCRIM No. 3470 instruction stated: "Self-defense is a defense to Count 1, the animal cruelty charge. The defendant is not guilty of that crime if he used force against a dog in lawful self-defense. The defendant acted in lawful self-defense if:

Fitzsimmons did not request, and the court did not give, the following optional clause in the standard CALCRIM No. 3470 instruction: "A defendant is not required to retreat. He or she is entitled to stand his or her ground and defend himself or herself and, if reasonably necessary, to pursue an assailant until the danger of death or bodily injury has passed. This is so even if safety could have been achieved by retreating."

At trial, the attorneys in closing arguments urged the jury to view the videos closely during their deliberations. Defense counsel argued that the videos supported Fitzsimmons's testimony that the dog lunged at him. The prosecutor argued that the video showed the dog did not lunge at Fitzsimmons.

---

"1. The defendant reasonably believed that he or someone else was in imminent danger of suffering great bodily injury;

"2. The defendant reasonably believed that the immediate use of force was necessary to defend against that danger; and

"3. The defendant used no more force than was reasonably necessary to defend against that danger. [¶] Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of bodily injury to himself or another. The defendant's belief must have been reasonable and he must have acted because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the defendant did not act in lawful self-defense. [¶] When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. If the People have not met this burden, you must find the defendant not guilty of animal cruelty."

6

DISCUSSION

## I. *Self-Defense Instruction*

A. *No Duty to Retreat*

Fitzsimmons contends the court's self-defense instruction was erroneous and prejudicial because the court did not on its own motion include an optional paragraph of the standard Judicial Council self-defense instruction stating that a defendant is not required to retreat.

A trial court must instruct the jury, even without a request, on all general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case. In addition, a defendant has a right to an instruction that pinpoints the theory of the defense. (*People v. Burney* (2009) 47 Cal.4th 203, 246.) A jury instruction is required only when there is substantial evidence to support it. (*People v. Avila* (2009) 46 Cal.4th 680, 705.) "We review a claim of instructional error de novo." (*People v. Barber* (2020) 55 Cal.App.5th 787, 798.)

Because Fitzsimmons never offered an instruction to the trial court regarding the lack of a duty to retreat, and instead agreed with the trial court's instruction, he forfeited any right to such an instruction. (Cf. *People v. Covarrubias* (2016) 1 Cal.5th 838, 901 [" '[A] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language' "].)

In any event, the prosecution never elicited testimony that Fitzsimmons was able to retreat. In fact, he testified he could not outrun a dog. His wife testified that she and Fitzsimmons just stood on the boardwalk and did not leave. Nor did the prosecution argue in closing that Fitzsimmons could or should have retreated. This claim of instructional error therefore

7

fails: "No evidence was introduced that appellant considered retreating but chose not to do so or that appellant could have retreated but did not do so. Thus, an instruction on the right not to retreat was not required." (*People v. Pruett* (1997) 57 Cal.App.4th 77, 89.)

Even assuming the trial court should have delivered an instruction on the right not to retreat, any error was not prejudicial in this case under either the federal or state standards. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 199 [California Supreme Court has "yet to determine whether a trial court's failure to instruct on a requested affirmative defense instruction supported by substantial evidence is federal constitutional error or state law error"]; *People v. Barber, supra,* 55 Cal.App.5th at p. 799 [error in refusing to give a requested pinpoint instruction is reviewed under *People v. Watson* (1956) 46 Cal.2d 818, 836].) Here, substantial evidence of the animal cruelty charge was presented in the form of K.O.'s testimony and the surveillance videos. The jury could also reasonably conclude that Fitzsimmons did not act in self-defense when he shot the dog because he used more force than was reasonable.

Fitzsimmons argues that "photo exhibits of escape routes in all directions across grass, sand, and boardwalk" as well as cross examination questions of himself and his wife provided "substantial evidence of ability to retreat." However, nothing in those photographs, standing alone, constitutes substantial evidence necessary to support an instruction regarding retreat. Substantial evidence is that which, if believed, would be sufficient for a reasonable jury to find a reasonable doubt as to the defendant's guilt. (*People v. Salas* (2006) 37 Cal.4th 967, 982-983.) Further, the jury was instructed that nothing the attorneys say is evidence. For tactical reasons, it is likely defense counsel did not seek a retreat instruction or object to the prosecutor's

8

questions that elicited Fitzsimmons's response that he could not outrun a dog, because his client successfully scored a direct and effective answer that made the prosecutor look foolish for not understanding that a dog can outrun a human.

B. *Ineffective Assistance of Counsel Claim*

Fitzsimmons alternatively contends his trial counsel was ineffective because he failed to request the retreat instruction. To establish ineffective assistance of counsel, a defendant must show that (1) counsel's performance was so deficient that it fell below an objective standard of reasonableness, under prevailing professional norms and (2) this deficient performance was prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 692; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.) Further, to avoid the distorting effects of hindsight, the United States Supreme Court has adopted "a strong presumption that counsel's performance [fell] within the wide range of reasonable professional assistance" and that the challenged actions reflected a " ' 'sound trial strategy.' " (*Strickland, supra,* 466 U.S. at p. 689.) In light of this presumption, deficient performance is especially difficult to demonstrate on direct appeal. If the record does not show why counsel chose to act or to not act, the reviewing court must reject challenges to counsel's conduct " ' "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." ' " (*People v. Kelly* (1992) 1 Cal.4th 495, 520.)

We "presume[e] that counsel's actions fall within the broad range of reasonableness, and afford 'great deference to counsel's tactical decisions.' " (*People v. Mickel* (2016) 2 Cal.5th 181, 198.) "[A] reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only

9

if there is affirmative evidence that counsel had ' " 'no rational tactical purpose' " ' for an action or omission." (*Ibid.*)  Further, " '[w]e cannot evaluate alleged deficiencies in counsel's representation solely on defendant's unsubstantiated speculation.' " (*People v. Bonilla* (2018) 29 Cal.App.5th 649, 658.)

Here, the record is silent as to defense counsel's reasons for not requesting the paragraph regarding no duty to retreat.  As we have explained, there was insufficient evidence supporting that additional paragraph.  Therefore, we can reasonably assume that was counsel's reason for not requesting that instruction.  Accordingly, Fitzsimmons has failed to carry his burden of proving ineffective assistance of counsel.

C. *Further Challenge to the Self-Defense Instruction*

Fitzsimmons argues the court's self-defense instruction erroneously stated he acted in lawful self-defense if he reasonably believed that he or someone else was in imminent danger of suffering bodily injury:  "[T]he court's instruction requiring a belief in imminent bodily injury erroneously elevated the standard above what the law requires."

Fitzsimmons relies on *People v. Myers* (1998) 61 Cal.App.4th 328, 330, which arose from a unique set of distinguishable facts.  In that case, the victim poked Myers in the chest during an argument and Myers reacted by pushing the victim away.  The victim fell and hit his head on the ground, sustaining severe neurological injuries.  The jury found Myers guilty of simple assault.  (*Id.* at p. 330.)  The Court of Appeal reversed the conviction on the ground that the trial court erroneously refused to instruct the jury with Myers's proposed instruction stating that he had a right to defend himself against a battery, even a battery that involved only an offensive touching, as opposed to an imminent danger of bodily injury.  (*Id.* at pp. 333-

10

336.)  It concluded, "To hold otherwise would lead to the ludicrous result of a person not being able to lawfully resist or defend against a *continuing* assault or battery, such as the act defendant alleged here."  (*Id.* at p. 335, fn. omitted, italics added.)  In this case, unlike in *Myers*, Fitsimmons did not propose a modification of the standard self-defense instruction, and no substantial evidence warranted any sua sponte modification of the standard instruction's requirement that a defendant must believe there was an imminent danger of great bodily injury.

## II.  *Joinder of Charges*

Fitzsimmons contends the trial court improperly joined the animal cruelty offense (count 1) and the contempt of court offenses (counts 3 and 4) under section 954 because they have no common characteristics or attributes and are not in the same class.  He also contends he received ineffective assistance because his counsel failed to object to the joinder of the counts or move to sever them.  Fitzsimmons finally contends joinder of the three cases resulted in a denial of his right to due process under the state and federal constitutions.

### A.  *Legal Principles*

Section 954 authorizes joinder of different offenses when they are "connected together in their commission . . . or [are] of the same class of crimes or offenses."  Joinder "is intended to promote judicial efficiency." (*People v. Landry* (2016) 2 Cal.5th 52, 75.)  "[J]oinder 'is the course of action preferred by the law.' "  (*People v. Westerfield* (2019) 6 Cal.5th 632, 689.) Nonetheless, the trial court has discretion to sever counts "in the interest of justice and for good cause shown."  (§ 954; see *Westerfield*, at p. 689.)

" 'When exercising its discretion, the court must balance the potential prejudice of joinder against the state's strong interest in the efficiency of a

joint trial.' [Citation.] To successfully claim that the trial court abused its discretion in denying a motion to sever, a ' " 'defendant must make a clear showing of prejudice' " ' by demonstrating that the denial 'exceeded the bounds of reason.' " (*People v. Westerfield, supra,* 6 Cal.5th at p. 689.)

This court independently reviews the legal question of whether two or more offenses may be joined as being "connected in their commission" or "of the same class." (*People v. Alvarez* (1996) 14 Cal.4th 155, 188.)

B. *Fitzsimmons Forfeited the Challenge*

Section 954 "imposes no sua sponte duty of severance on trial courts." (*People v. Maury* (2003) 30 Cal.4th 342, 392.) Rather, it "requires the defendant to make a showing of 'good cause' in order to obtain severance, and defendant's failure to request a severance waives the matter on appeal." (*Id.* at p. 940.) Because Fitzsimmons failed to request severance of the contempt counts, he has forfeited his claim on appeal. (*Ibid.*)

C. *Ineffective Assistance of Counsel Claim*

Regarding his ineffective assistance of counsel claim, we find neither incompetence of counsel nor prejudice resulting from Fitzsimmons's attorney's failure to move for severance under *Strickland, supra,* 466 U.S. at p. 689, as set forth above. Fitzsimmons argues that if his counsel had moved to sever the counts, the court would have been required to grant it because the joinder of the contempt charges unfairly prejudiced him.

The contention requires us to address the merits. We conclude joinder of the animal cruelty and contempt of court offenses was permissible because they were "connected together in their commission." (§ 954.) Offenses committed at different times and places against different victims are nevertheless " 'connected together in their commission' " if they are linked by a " 'common element of substantial importance.' " (*Alcala v. Superior Court*

12

(2008) 43 Cal.4th 1205, 1219.)  Here, the charges were connected in their commission because after Fitzsimmons shot the dog, police applied for the GVRO, which was granted three days later.  The GVRO stated that it was issued because Fitzsimmons  was in immediate danger of causing personal injury to himself or another person by possessing the firearm he used to shoot the dog three days earlier.  Police attempted to serve it on Fitzsimmons that same day, but he was in Mexico.  Police therefore served the GVRO on Fitzsimmons upon his return.  A joint trial would conserve judicial resources by ensuring there was no need to recall the same witnesses in two separate proceedings.  (See *People v. Soper* (2009) 45 Cal.4th 759, 722; see *People v. Alcala, supra,* 43 Cal.4th at p. 1217 [the language "connected together in their commission" in section 954 reflects a legislative intent for a "very broad test for joinder"].)

"Where joinder is proper under section 954, '[t]he burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.' " (*People v. Gomez* (2018) 6 Cal.5th 243, 275.)  " 'In determining whether a trial court's refusal to sever charges amounts to an abuse of discretion, we consider four factors: (1) whether evidence of the crimes to be jointly tried is cross-admissible; (2) whether some charges are unusually likely to inflame the jury against the defendant; (3) whether a weak case has been joined with a stronger case so that the spillover effect of aggregate evidence might alter the outcome of some or all of the charges; and (4) whether any charge carries the death penalty or the joinder of charges converts the matter into a capital case.' [Citation.]  'We then balance the potential for prejudice to the defendant from a joint trial against the countervailing benefits to the state.' [Citation.]  However, '[i]f the evidence underlying the joined charges would

13

have been cross-admissible at hypothetical separate trials, "that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges." ' " (*People v. Westerfield, supra,* 6 Cal.5th at p. 689.)

Here, the evidence that related to the counts of animal cruelty and disobeying a court order was cross-admissible.  The only reason police sought a GVRO was because Fitzsimmons had fired his gun and shot the dog.

Further, joinder of the animal cruelty charge with the contempt charges was not likely to unduly inflame the jury against Fitzsimmons, because the facts relating to contempt charges, which involved a failure to disclose to police the ammunition's location were not inflammatory, unlike the facts surrounding the animal cruelty charge.  Also, the jury was instructed with CALCRIM No. 3515 [multiple counts: separate offenses], which stated, "Each of the counts charged in this case is a separate crime. You must consider each count separately and return a separate verdict for each one."  There was no potential prejudice of any spill-over in evidence between the counts.

We point out the evidence supporting the animal cruelty count was strong.  Fitzsimmons shot the dog in the face, which was an unreasonable response to the dog barking at him.  Thus, even though the evidence supporting the disobeying a court order was weak and it was subsequently dismissed, it would not have altered the outcome of the animal cruelty charge given the overwhelming evidence supporting it.  Finally, here there were no capital case considerations.  We therefore conclude no basis existed for a severance of the contempt charges from the animal cruelty charge.  The ineffective assistance of counsel claim fails.

14

If a defendant shows that joinder actually resulted in "gross unfairness" amounting to a denial of due process, the judgment must be reversed." (*People v. Elliott* (2012) 53 Cal.4th 535, 553; *People v. Mendoza* (2000) 24 Cal.4th 130, 162.) "In resolving a claim that joinder resulted in gross unfairness in violation of a defendant's right to a fair trial and due process, we have observed that a judgment will be reversed on this ground only if it is 'reasonably probable that the jury was influenced [by the joinder] in its verdict of guilt.' " (*People v. Merriman* (2014) 60 Cal.4th 1, 49.)

Courts have found no due process violation from joinder where evidence of each crime is simple and distinct, even if that evidence is not admissible in separate trials. (*People v. Soper, supra*, 45 Cal.4th at p. 784.) The fact that the jurors could not reach a verdict on the contempt charges clearly demonstrates the jurors "considered and weighed the evidence carefully as to each charge separately." (*People v. Moore* (1986) 185 Cal.App.3d 1005, 1013.) Considering the trial as a whole, joinder of the animal cruelty and the disobeying a court order charges did not result in any gross unfairness that violated due process. (See *People v. Elliott, supra*, 53 Cal.4th at p. 553.)

III. *Carrying a Loaded Firearm Conviction*

Fitzsimmons claims his conviction for carrying a loaded unlicensed firearm, in violation of section 25850, subdivision (a), must be reversed because "California's licensing scheme for carrying a firearm is unconstitutional under *Bruen*." (Some capitalization omitted.)

" ' "A defendant challenging the constitutionality of a statute carries a heavy burden: 'The courts will presume a statute is constitutional unless its unconstitutionality clearly, positively, and unmistakably appears; all presumptions and intendments favor its validity.' " ' [Citations.] Typically, a litigant may challenge the constitutionality of a statute in two ways: on its

face or as applied." (*In re D.L.* (2023) 93 Cal.App.5th 144, 156 (*D.L.*).) "A facial challenge seeks to void the statute as a whole by showing that ' "no set of circumstances exists under which the [statute] would be valid," i.e., that the law is unconstitutional in all' " (*id.* at p. 157) or at least the " ' "great majority of cases." ' " (*In re T.F.-G.* (2023) 94 Cal.App.5th 893, 909 italics omitted.) In contrast, a defendant making an "as applied" challenge to a statute "seek[s] 'relief from a specific application of a facially valid statute or ordinance to an individual or class of individuals who are under allegedly impermissible present restraint or disability as a result of the manner or circumstances in which the statute or ordinance has been applied.' " (*D.L.*, at p. 157.)

Section 25850 makes it a crime to publicly carry a loaded firearm on one's person or in a vehicle. "Although framed as a default prohibition, section 25850 is in effect the enforcement mechanism of a regulatory regime that grants licenses to those who may lawfully carry firearms and withholds licenses from those who may not." (*In re T.F.-G., supra,* 94 Cal.App.5th at p. 915.) In isolation, section 25850 "appears broadly prohibitory, [but] it exists within a framework of numerous express exemptions." (*Id.* at p. 908.) One such exemption is section 26010, which provides that section 25850 does not apply to persons with concealed carry permits issued under sections 26150 to 26235.

Until recently, those licensing provisions were discretionary in that they required the applicant to prove, among other things, that "good cause" existed for the issuance of the license and granted the issuing authority discretion to issue the license. At the time Fitzsimmons was charged, section 26150 provided that "the sheriff of a county *may* issue a [concealed carry] license to [an eligible applicant] upon proof of all of the following: [¶] (1) The

16

applicant is of good moral character. [¶] (2) *Good cause exists for issuance of the license.* [¶] (3) The applicant is a resident of the county or a city within the county, or the applicant's principal place of employment or business is in the county or a city within the county and the applicant spends a substantial period of time in that place of employment or business. [¶] (4) The applicant has completed a course of training [relating to firearms safety, handling, shooting, and permissible usage]." (Former § 26150, subd. (a), italics added.) Section 26155 employed similar language. (See former § 26155, subd. (a) ["the chief or other head of a municipal police department of any city or city and county" may similarly issue licenses]; see also former § 26202 [if the licensing authority determines good cause does not exist, it must state the reason for that determination].)

The United States Supreme Court has held that the Second Amendment of the federal Constitution confers an individual right to keep and bear arms for the core lawful purpose of self-defense and that a District of Columbia ban on handgun possession in homes was therefore unconstitutional. (*District of Columbia v. Heller* (2008) 554 U.S. 570, 595, 630.) But the court also noted that "the right secured by the Second Amendment is not unlimited" and does not include "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." (*Id.* at p. 626.) For example, "prohibitions on the possession of firearms by felons and the mentally ill [and] laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are "presumptively lawful regulatory measures." (*Id.* at pp. 626-627, & fn. 26.)

In 2022, the United States Supreme Court extended *District of Columbia v. Heller, supra,* 554 U.S. 570, to recognize "an individual's right to carry a handgun for self-defense outside the home." (*Bruen, supra,* 597 U.S.

17

at p. 10.) After clarifying the proper test for analyzing challenges under the Second Amendment (*id.* at pp. 22-24), the *Bruen* court determined New York's concealed carry licensing scheme, which required applicants to demonstrate "proper cause" to get a license, was unconstitutional because it prevented law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms. (*Id.* at p. 71.) The court contrasted the proper cause requirement in "may issue" concealed carry licensing regimes, such as New York's and California's, with "shall issue" jurisdictions, where authorities must issue concealed carry licenses whenever applicants satisfy certain threshold requirements, without the ability to deny licenses based on a perceived lack of need or suitability. (*Id.* at pp. 13-15.)

The California Legislature subsequently amended sections 26150 and 26155 to remove the "good cause" and good character requirements and to make issuance of a concealed carry license mandatory if certain requirements are met ("shall issue"), rather than discretionary ("may issue"). (See Stats. 2023, ch. 249, § 10, eff. Jan. 1, 2024.)

The People contend Fitzsimmons lacks standing to challenge California's concealed carry licensing scheme since he never applied for a concealed carry permit. We assume without deciding that Fitzsimmons does have standing to challenge the scheme's constitutionality. (See *People v. Miller* (2023) 94 Cal.App.5th 935, 942; cf. *D.L. supra,* 93 Cal.App.5th at p. 161 [juvenile who was subjected to a true finding that he unlawfully possessed a loaded firearm had standing to bring facial challenge to the constitutionality of section 25850].)

Fitzsimmons's facial challenge to the concealed carry licensing scheme presents a pure question of law, which we review de novo. (*D.L., supra,* 93 Cal.App.5th at p. 156.) *Bruen* invalidated only one of California's statutory

18

prerequisites for obtaining a public carry license—the "good cause" requirement in former sections 26150 and 26155. It did not invalidate all public carry licensing schemes or prohibit states from requiring individuals to submit to certain licensing requirements in order to legally possess a firearm. Indeed, the *Bruen* court confirmed that states may validly impose "reasonable, well-defined restrictions" on the "right to bear commonly used arms in public." (*Bruen, supra,* 597 U.S. at p. 70.) It emphasized that nothing in the opinion should be interpreted to suggest that "shall-issue" licensing regimes, "which often require applicants to undergo a background check or pass a firearms safety course," are unconstitutional. (*Id.* at p. 38, fn. 9; see also *id.* at pp. 79-80 (conc. opn. of Kavanaugh, J.) [noting the court's "decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense," and explaining that "shall-issue regimes," which often require the applicant "to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force," are "constitutionally permissible"].)

California courts have uniformly rejected the argument that California's licensing scheme is unconstitutional under *Bruen, supra,* 597 U.S. 1. (*People v. Mosqueda* (2023) 97 Cal.App.5th 399, 403 ["*Bruen* did not render California's entire licensing scheme or the charges against them unconstitutional" because "[t]he offending 'good cause' requirement is severable from the remainder of the licensing statute, as is the 'good moral character' element"]; *In re T.F.-G., supra,* 94 Cal.App.5th at p. 899 ["Although California's 'good cause' licensing requirement is undisputedly unconstitutional under *Bruen*, [that] . . . does not render section 25850 facially unconstitutional"]; *D.L., supra,* 93 Cal.App.5th at pp.147-148

19

[rejecting facial challenge to section 25850, subdivision (a) (carrying a loaded firearm) and concluding "[i]t remains constitutional to punish someone without a license for carrying a loaded gun in public"]; *People v. Miller, supra,* 94 Cal.App.5th at pp. 943-946 [reversing order sustaining demurrer to charge of carrying a concealed firearm in a vehicle under one's control (§ 25400), finding charge was constitutional].)

In *D.L.* for example, the Court of Appeal found that after severing the "good cause" licensing requirement from former sections 26150 and 26155, "California's firearm licensing framework—and the criminal penalties under section 25850—remain valid." (*D.L., supra,* 93 Cal.App.5th at p. 165.) The court reasoned that "the *Bruen* majority's actual holding was quite limited— that New York's 'proper-cause' licensing requirement was unconstitutional," and "*Bruen* did not undermine regulation of guns based on objective criteria." (*D.L.,* at p. 165.)

In *D.L.*, the defendant made arguments similar to those offered by Fitzsimmons here: that even if the "good cause" condition can be severed, sections 26150 and 26155 are still unconstitutional under *Bruen, supra,* 597 U.S. 1, because (1) they afford unfettered discretion to the relevant law enforcement official who "may issue" a license under each statute, and (2) the statutes still include a subjective condition that the applicant be of "good moral character." (*D.L., supra,* 93 Cal.App.5th at p. 166.)

The *D.L.* court rejected those arguments and so do we. "D.L.'s argument is not supported by the actual holding in *Bruen*[*, supra,* 597 U.S. 1]. As described above, that holding was based on the 'proper cause' language in the New York statute, not on its use of the phrase 'may issue.' [Citation.] Nor did *Bruen* include any holding regarding the 'good moral character' condition. [Finally,] D.L.'s new argument concerning the 'may issue'

20

language in sections 26150 and 26155 is an 'as applied' constitutional challenge and not a facial challenge because the argument would not apply in all circumstances." (*D.L., supra,* 93 Cal.App.5th at p. 166.) "For all of these reasons," the *D.L.* court "conclude[d] that section 25850 is enforceable and is not unconstitutional on its face. It does not pose a present total and fatal conflict with applicable constitutional prohibitions." (*Id.* at p. 167.)

DISPOSITION

The judgment is affirmed.


O'ROURKE, Acting P. J.

WE CONCUR:


DATO, J.


BUCHANAN, J.